JONES et al. v. SPRINGER et al.

No. 6248.

Court of Civil Appeals of Texas. Amarillo.
Oct. 13, 1952.

Motion for Rehearing Overruled
Nov. 17, 1952.

Wagstaff, Harwell, Wagstaff & Alvis, Rupert Harkrider, Abilene, Morris G. Watson, Roby, Andrews, Kurth, Campbell & Bradley, Richard F. Burns, Vinson, Elkins & Weems, Ben H. Rice, III, Fountain, Cox & Gaines, Willard B. Wagner, Williams, Lee & Kennerly, Houston, Ratliff, Conner & Walker, Spur, for appellants.

McMahon, Springer, Smart & Walter, Sayles & Sayles, Abilene, Price Daniel, Atty. Gen., Jesse P. Luton, Jr., Asst. Atty. Gen., for appellees.

PITTS, Chief Justice.

This is an appeal from an interlocutory order appointing a receiver to take exclusive possession of certain lands situated in Kent County, Texas, and hold them pending final judgment in an action previously filed in Kent County District Court to determine ownership of the said lands. The action which gave rise to this proceeding is a trespass to try title suit filed on October 24, 1951, by some of the appellants herein, namely: Ruth Legett Jones, Julia Jones Matthews, Edith Jones and First National Bank in Dallas, a corporation, independent executors and trustees of the last will and testament of Percy Jones, deceased, and General Crude Oil Company, a corporation, against J. R. Strayhorn, R. L. Springer, C. E. Leon, W. E. (Mike) Barron, W. W. Barron, E. B. Sullivan, Marvin O'Brien and Livestock National Bank of Chicago, a corporation. Soon thereafter the Livestock National Bank of Chicago, Strayhorn, Leon and W. W. Barron disclaimed any interest while other defendants, having been cited, answered in the primary suit which was still pending. Thereafter on March 6, 1952, the State of Texas, acting by and through the State Attorney General intervened claiming an undivided interest in the lands described in plaintiffs' petition including a portion of the Salt Fork of the Brazos River, a statutory navigable stream, which traverses a portion of the lands in litigation. In the original trespass to try title suit plaintiffs described the lands here in litigation by metes and bounds and alleged them to be parts of Sections 1, 3 and 5, John Rodman Survey. The State prayed for judgment for its undivided interest in the lands and likewise sought the appointment of a receiver to take possession of the said lands pending a final judgment to determine the true owners of the same. Thereafter on March 19, 1952, R. L. Springer, a defendant in the original suit, also asked for the appointment of a receiver for the protection of his interests and that of all other parties interested, there claiming for himself an undivided one-half interest in the lands described by the plaintiffs in their original petition filed in the primary suit. In the meantime on March 15, 1952, Charles B. Wrightsman and Frank Stewart intervened in the original suit, claiming an interest in the land in question. Thereafter on March 25, 1952, Superior Oil Company and Gulf Producing Company each intervened in the original suit claiming an interest, respectively, in the lands in question and each of them seeking further to have the receivership hearing abated until other numerously named persons, companies or corporations, could be made parties to the original suit and the hearings to be had. Other parties in the original suit also answered in this action and filed pleas in abatement on the grounds that others should be named as parties to the original suit.

On March 25, 1952, after notice and with all parties present, the trial court heard all dilatory pleas, numerous special exceptions and the applications for the appointment of a receiver and took all matters under consideration for further deliberation. Thereafter on May 3, 1952, the trial court overruled all dilatory pleas and exceptions, found that the Salt Fork of the Brazos River, particularly where it traversed the land in question, was a statutory navigable stream; that applicants, the State of Texas, on behalf of the State's school fund, and R. L. Springer, each had a probable interest in the lands in question; that the properties under consideration were in danger of being lost, destroyed or materially damaged because of producing oil and gas wells on other lands in the immediate vicinity of these lands and that both applicants, because of their probable interest in the lands and the existing threatening conditions, were entitled to have a receiver appointed to take charge of the lands in question. For the reasons stated the trial court appointed Tom Davis receiver, upon the proper execution of a bond in the sum of $25,000 and the taking of the oath required by law, and directed him to take exclusive possession of the lands described in plaintiffs' original petition, together with the Salt Fork of the Brazos River as it traverses the lands in question, the same being located in Sections 1, 3 and 5, John Rodman Survey, in Kent County, Texas. The receiver was further

authorized by the said order to take such action as may be necessary in contracting for the drilling of wells in or bottomed under the bed of portions of the said river as it traverses the said lands, to obtain from the State Railroad Commission permits for the drilling of such wells upon the said property, and to produce, save, transport and take care of the oil and gas produced from the said properties or the proceeds from the sale thereof until final judgment is entered in the principal suit to determine ownership of the said lands and to return the said properties or proceeds therefrom over to the true owners as reflected by the said final judgment. It was further ordered by the trial court, however, that no contracts for drilling of wells upon the said lands or for the sale of products therefrom be made by the receiver without first making application to and receiving authority and direction from the trial court after a notice in writing has been given all parties of record through their attorneys respectively of record and a hearing had before the court.

The heirs of Percy Jones, deceased, and First National Bank of Dallas as executors and trustees of the Percy Jones estate, General Crude Oil Company, Texas Gulf Producing Company, Superior Oil Company, Charles B. Wrightsman and Frank Stewart each gave notice of appeal from the trial court's judgment and each has perfected an appeal to this court. The said appellants have presented five separate briefs and have assigned numerous errors of the trial court. All points of error are being fully considered but it is our opinion that they need not be numerically and separately discussed by us. Appellees have filed separate briefs and their applications for receivership will be separately disposed of except for the matters of common interest between them.

■ The trial court properly reserved the determination of the final issues as to ownership for the trial of the principal case on its merits. It was here concerned only with the questions of probable interest of each of the appellees as the applicants for receivership jointly with others in own-ership of the said lands and the danger, if any, of the property being lost, removed or materially injured. Subdivision 1 of Article 2293, Vernon's Annotated Civil Statutes, as construed by the court in the case of Anderson & Kerr Drilling Co. v. Bruhlmeyer, 134 Tex. 574, 136 S.W.2d 800, 127 A.L.R. 1217.

■ In the case at bar the heirs of Percy Jones, deceased, and First National Bank of Dallas as executors and trustees of the Percy Jones estate and General Crude Oil Company claim to be owners in fee simple of all the lands in question. They are in possession of the same, claiming adverse possession thereto and denying that applicants in this action have any interest therein. Charles B. Wrightsman and Frank Stewart have intervened claiming an interest in the lands. Superior Oil Company and Gulf Producing Company each intervened asserting ownership, respectively, to certain mineral interests in the lands and both named numerous others who, they allege, likewise own an interest in the lands. Applicants for receivership assert and claim only an alleged undivided interest, respectively, in the lands and it is admitted that others are joint owners and are interested also in the lands in question and that the primary suit will later determine the proper ownership of the lands. We are concerned primarily with the question of whether or not the trial court abused its discretion in exercising its authority under the provisions of Subdivision 1 of Article 2293 in appointing a receiver.

The State of Texas pleaded ownership in fee simple of an undivided interest in those portions of the Salt Fork of the Brazos River, a statutory navigable stream, located within the three Surveys of land in question, alleging such interest to be 19.04 acres in Survey 1, 18.38 acres in Survey 3 and 18.44 acres in Survey 5. It further pleaded that its said interest represents the number of acres of land, respectively, in excess of that conveyed to the patentees in the original patents granted by the State. It also pleaded its right to share proportionately in the minerals under the lands but that it is being denied such right by

means of numerous producing oil and gas wells already being operated by plaintiffs in the primary suit or those holding under them, in close proximity to and surrounding the lands in question, thus draining to its damage the oil and gas underlying the lands in which the State has an undivided interest. For these reasons the State sought the appointment of a receiver to protect its interests and property rights.

Article 5302, Vernon's Annotated Civil Statutes, says in part that: "All streams so far as they retain an average width of thirty feet from the mouth up shall be considered navigable streams within the meaning hereof, and they shall not be crossed by the lines of any survey." In the case of Diversion Lake Club v. Heath, 126 Tex. 129, 86 S.W.2d 441 (October 2, 1935), the court held that the said law has been effective since 1887 and that its purpose is to make all streams navigable in law which have an average width of 30 feet, whether they are actually navigable or not, and by such statute the beds of all such streams were reserved to the State. The same authority likewise held that statutory navigable streams in Texas are public streams, and their beds and waters are owned by the State in trust for the benefit and best interest of all the people, and subject to the use by the public for navigation, fishing and other lawful purposes as fully and to the same extent as streams navigable in fact are used. A stream is therefore a statutory navigable stream if it retains an average width of 30 feet or more from its mouth up. State v. Bradford, Tex.Civ.App., 25 S.W.2d 706, affirmed in part and reversed in part on other grounds, 121 Tex. 515, 50 S.W.2d 1065.

■ A contour map prepared by the Brazos River Conservation and Reclamation District was introduced in evidence showing the width of the Salt Fork and the confluence of it and the Double Mountain Fork of the Brazos River. It reveals that the minimum width of the Salt Fork is approximately 125 feet and the maximum width more than 1,200 feet. Another printed topographical map of the United States Geological Survey and the State Board of Water Engineers was introduced in evidence showing a portion of the Salt Fork to be from 165 feet to 1,300 feet wide. Six witnesses who were well acquainted with the Salt Fork of the Brazos River, including M. R. Estes, a licensed State land surveyor, who had surveyed the lands here in question and across the Salt Fork of the Brazos River many times, testified as to the width of the said river. Their testimony shows that the said river has banks on both sides, had a channel, flows at times and is dry at times, and all of the said witnesses testified that the Salt Fork was more than 30 feet wide at every place known to them. In fact, the minimum width fixed by any witness was 100 feet and the maximum width fixed was more than 1,300 feet. It clearly appears from the evidence and the law governing such that the trial court was justified in finding and concluding that the Salt Fork of the Brazos River is a statutory navigable stream. According to the facts and the authorities cited, title to that portion of the said river traversing Surveys 1, 3 and 5 did not pass to the original patentees of these Sections.

The successors of the original patentees may attempt to rely upon the provisions of Article 5414a, passed by the Legislature in 1929, effective March 3, 1929, and commonly called the "Small Bill" to sustain their claims of title. The said Act does validate, with certain exceptions, the claims of patentees and awardees and their assigns to lands and minerals therein contained lying across or partly across water courses and navigable streams and being parts of surveys to which patents or awards have been issued. The said Act also relinquishes, quitclaims and grants the patentees and awardees and their assigns, with certain exceptions, the lands and minerals therein lying across or partly across water courses and navigable streams and being parts of surveys to which patents and awards have been made. The Small Bill appears therefore to be both a validating act and a grant. However the grant is conditioned, viz.: "* * * that nothing in this Act * * * shall relinquish or quit-claim any number of acres of land in excess of the number of acres of land conveyed to said patentees or

awardees in the original patents granted by the State * * *." The effect of the cited condition limits the grant only to the number of acres granted and fixed by the original patents.

The record here reveals that the patentees or awardees obtained title to Surveys 1, 3 and 5 under separate transactions in April of 1884 as provided for in an Act of the 16th Legislature, Sp.Sess.1879, Chapter 52, Page 48 and amendments thereto. The said Act was commonly referred to as the "Fifty Cent Law". Section 6 thereof provided that: "No tract of land shall be sold under the provisions of this act that contains more than six hundred and forty acres * * *." Section 6, as amended by the 17th Legislature Gen.Laws 1881, Chapter 33, Page 24, provided that: These lands shall be sold in tracts of six hundred and forty acres each * * *." The uncontradicted testimony of M. R. Estes, a licensed State Land Surveyer, and other record evidence, reveals that the original patents to each of the Surveys 1, 3 and 5 called for and granted 640 acres while actually there was an excess of a fraction more than 18 acres in each survey. In fact, there is evidence showing an excess of 19.24 acres in Survey 3.

■ Since the granting clause of the Small Bill is conditional as between the State and its patentees or awardees, the claimants thereunder, who rely upon the provisions of the said Bill for security of title, are required to bring themselves within the conditional provision. In the case at bar such parties have not only failed to bring themselves within the conditional clause referred to but the contrary has been conclusively established.

■ Under the record presented the trial court was justified in finding and concluding that the State of Texas probably owns an undivided interest in the Salt Fork of the Brazos River within the said Surveys to the extent of at least 18.52 acres of excess land in Survey 1, 18.43 acres of excess land in Survey 3 and 18.56 acres of excess land in Survey 5. Heard v. State, 146 Tex. 139, 204 S.W.2d 344, and other authorities there cited.

■ We next consider the question of the danger of the property being lost, removed or materially injured. There is an abundance of uncontradicted evidence showing wells being drilled and numerous producing wells within close proximity to the Salt Fork River bed and showing drainage of the oil and gas under the portions of the Salt Fork traversing Surveys 1, 3 and 5 and here claimed by the State of Texas. The evidence conclusively supports the findings of the trial court to the effect that the properties in question are in danger of being lost, destroyed or materially injured by reason of drainage from the wells located near the said river at said points.

■ An application for the appointment of a receiver is addressed to the sound discretion of the trial court and its action will not be disturbed on appeal unless a clear abuse of discretion is shown. Under the facts and circumstances presented here it is our opinion that the trial court did not abuse its discretion in appointing a receiver upon the application of the State of Texas to serve as such under the direction of the court until final judgment is rendered in the principal suit then pending. Appellants' points to the contrary are all overruled. In addition to authorities already cited we further cite the following cases: Boger v. Moore, Tex.Civ. App., 196 S.W.2d 646; Ellis v. Filgo, Tex. Civ.App., 185 S.W.2d 739; Cash v. Ervin, Tex.Civ.App., 62 S.W.2d 242; Law v. Lubbock Nat. Bank, Tex.Civ.App., 11 S.W.2d 244; Berkshire Petroleum Corporation v. Moore, Tex.Civ.App., 268 S.W. 484.

The appointment of a receiver upon the application of the State will protect appellee Springer in whatever interest in the property, if any, he may show himself entitled to in the trial of the primary action just as it will protect all others who show themselves to have an interest in the property. Nevertheless, Springer's application for a receivership will also be now considered by us.

■ Appellee R. L. Springer pleaded that he owned an undivided one-half interest in the lands and that his interest was

in danger of being lost, removed or materially injured because of the existence of producing oil wells drilled in close proximity to the lands in question by plaintiffs and certain interveners in the principal suit who are appellants in this action. The issue of the danger of the property being lost, removed or materially injured has already been disposed of by us, leaving only the question of Springer's probable interest in the property for our disposition. In the action for receivership Springer was not charged with the burden of proving absolute ownership of interest in the lands but only to establish that he has a probable right to or interest in the property. Anderson & Kerr Drilling Co. v. Bruhlmeyer, supra. We have already sustained the trial court in holding the Salt Fork of the Brazos River to be a statutory navigable stream and the law makes it such clearly stating that it shall not be crossed by any survey lines. We have already discussed the effect of the Small Bill which will be hereafter referred to, however. The contention of 10 years adverse possession made by the heirs of Percy Jones, deceased, and the Dallas Bank is overruled by an authority previously cited, Heard v. State, supra. It must be presumed that the trial court found against the said parties on such claim. According to the record before us the trial court was justified in so finding.

Sections 1, 3 and 5, John Rodman Survey, were patented in the names of Slaughter and O'Connor and sold to John Rodman then by him conveyed by regular chain of title to D. R. Kendall, who conveyed them on April 1, 1924, to W. W. Barron. D. R. Kendall was the assignee of John Rodman the awardee and Slaughter and O'Connor the patentees. The consideration named in the last deed referred to was $25,000 cash and $46,132 vendor's lien note due on or before one year from date, together with the assumption by Barron of $100,000 due Herman P. Farris of Clinton, Missouri. This indebtedness was renewed, extended and continued in force and became a part of a debt owed by Barron to Chicago Livestock Loan Company when a deed of trust of date December 31, 1929, was executed by Barron and others covering Section 5, Rodman Survey, and other lands and delivered to B. B. Stone as trustee, to secure this and other indebtedness owed by Barron to Chicago Livestock Loan Company. The said deed of trust was foreclosed in the District Court of Tarrant County on November 5, 1931, and J. P. Maddox was appointed receiver to sell the land and it was sold by Maddox on April 5, 1932, to Chicago Livestock Loan Company. On December 21, 1935, Chicago Livestock Loan Company conveyed that part of Survey 5 east of the Salt Fork of the Brazos River, the same being 493.6 acres, to Percy Jones. On December 30, 1948, Chicago Livestock Loan Company conveyed to Marvin M. O'Brien any and all remaining interest it had in the lands in question. On August 1, 1924, W. W. Barron conveyed to J. A. Price "a part of Sections 3 and 5, John Rodman Survey". On November 29, 1924, W. W. Barron conveyed to A. Wood "a part of Sections 3 and 5, John Rodman Survey". On February 9, 1925, W. W. Barron conveyed to R. G. Maben, Jr., the south one-half of Section 1, John Rodman Survey. It will be remembered that Sections 1, 3 and 5 each contained 640 acres when patented and when acquired by Barron from Kendall but only parts of these Surveys, respectively, were conveyed by Barron to the foregoing named parties. Except for these conveyances W. W. Barron and the Chicago Livestock Loan Company owned all of Sections 1, 3 and 5 at the time the Small Bill was passed in 1929. As a result of the Small Bill the State "quit claimed" to Barron and the Chicago Livestock Loan Company all of the Salt Fork River bed over and above, if any there be left, the excess acreage existing in each Section. Barron or the said Company, or both, therefore owned at that time any part of the said river bed over and above the said excess acreage. On August 28, 1950, W. W. Barron conveyed to appellee R. L. Springer any and all remaining interest he had in the lands here in litigation. On January 31, 1951, appellee R. L. Springer and Marvin M. O'Brien executed a partition deed equally dividing

between themselves whatever interest they both owned in the lands in question. It therefore appears from the record that W. W. Barron acquired title to all of Surveys 1, 3 and 5 from D. R. Kendall on April 1, 1924, but that he probably did not thereafter divest himself of title to all of the lands therein contained until he conveyed to Springer on August 28, 1950, the remainder of his interest therein. It likewise appears that the Chicago Livestock Loan Company still owned some interest at least in Section 5 when it conveyed whatever interest it had left to Marvin M. O'Brien on December 30, 1948. When Springer and O'Brien partitioned their joint undivided interest, each then owned not only the one-half interest he previously owned but also an undivided interest in whatever interest the other had.

A careful examination of the record reveals sufficient evidence of probative force to support the trial court's findings and conclusions to the effect that appellee R. L. Springer probably owns an undivided interest in the lands in question. In view of our conclusions previously herein determined it is our opinion that the trial court was justified in appointing a receiver upon the application of appellee R. L. Springer and appellants' points to the contrary are all overruled.

An examination of the record reveals no reversible error by the trial court. Its judgment is therefore affirmed.