Robert R. SHELTON, et al., Plaintiffs,

v.

EXXON CORPORATION, Defendant.

Civ. A. No. H–83–1575.

United States District Court, S.D. Texas, Houston Division.

Aug. 11, 1989.

---

Joseph D. Jamail, Gus Kolius, Frank M. Staggs, Jr., Joseph H. Reynolds, Joe H. Foy, and Mary Katherine Kennedy, Houston, Tex., for plaintiffs.

Frank G. Harmon, Michael P. Graham, Paula M. Desel, Barry L. Wertz, and W.N. Blanton, III, Houston, Tex., for defendant.

## MEMORANDUM OPINION

SINGLETON, District Judge.

This Memorandum Opinion supersedes the Court's previous Memorandum Opinions.

Robert Shelton and various related corporate entities (Shelton Ranch Corporation, Shelton Ranches, Inc., and Shelton Land and Cattle company) (collectively, "Shelton") filed their Original Petition in the Texas state courts in 1979. Shelton made his claims against essentially two defendants: Exxon Corporation ("Exxon"), and King Ranch, Inc., and King Ranch Oil and Gas, Inc. (collectively, "King Ranch"). The claims arise from gas leases executed between the King Ranch and Exxon's predecessor, Humble Oil and Refining Company. Shelton alleged claims against Exxon for underpayment of royalties and for imprudent marketing of the King Ranch Gas. Only Exxon remains as a defendant. Trial was to the bench.

## THE FIRST CLAIM

### I. BACKGROUND

This portion of the Memorandum Opinion resolves the first claim, which concerns whether royalty payments were made pursuant to a proper interpretation of the parties' contractual definition of market value. Shelton makes this claim directly against Exxon, although most of his rights to receive or benefit from royalty payments originate in transactions that reserved to the King Ranch a mineral interest and the exclusive executive rights over the leases, including the exclusive right to enforce the obligations of the leases.[1]

The King Ranch refused to pursue the claim for underpayment of royalties in a manner satisfactory to Shelton. On June 5, 1980, the King Ranch and Exxon settled between themselves those claims for addi-

---

1. The claim of Shelton Land and Cattle Company is based on a very different transaction. *See infra.*

tional royalties which accrued before September 1, 1980. As executive, the King Ranch also purported to act for and bind all other mineral interest owners, including Shelton. The King Ranch contested Shelton's right to participate in the negotiation of those claims, and a settlement between the King Ranch and Exxon was made without the participation and over the protest of Shelton. Shelton now pursues against Exxon claims that the King Ranch purported to settle. This Memorandum Opinion partially sustains the settlement against Shelton's challenge and disposes of all Shelton's claims made the subject of that settlement.

The particular interests owned by Shelton and the manners in which he came by them are complex, but they need not be fully set out for the purpose of this Memorandum Opinion. The following language appears in a 1957 transfer and is typical[2] of the language accompanying all the grants of mineral interests to Shelton and his predecessors:

> King Ranch, its successors, and assigns shall have the exclusive right *to enforce the obligations of such leases,* contracts and other instruments *and to contract and negotiate with the lessee or lessees* [Exxon's predecessors] *thereunder with respect to such obligations.* The rights and powers herein conveyed to King Ranch shall be considered and construed as rights and powers coupled with an interest and shall not be revocable by grantor herein [Shelton's predecessor], or his successors and assigns. (emphasis added)

All of Shelton's non-executive mineral interests were subject to like restrictions.

In a later transaction not dealing with mineral interests, the language used to grant or reserve similar rights to the King Ranch was broader. As part of that transaction, the King Ranch conveyed to Shelton Land and Cattle Company 11.22% of the King Ranch's own claim against Exxon for underpayment of royalties (as that claim

existed on December 31, 1977). Thus, Shelton Land and Cattle became a creditor of the King Ranch in an unliquidated amount. The grant of the 11.22% was made subject to the executive rights of the King Ranch. The King Ranch also expressly reserved very broad powers to compromise or even forego its remedies against Exxon without liability to Shelton Land and Cattle. However, we concern ourselves first with the less well-defined of the King Ranch's powers, the executive right to enforce the obligations of the lease.

## II. THE SCOPE AND VALIDITY OF THE EXECUTIVE RIGHTS

Shelton's first claim rests on four basic legal arguments. First, Shelton argues that the making of past due royalty payments is not an obligation of the lease. Thus, the King Ranch's power to enforce the obligations of the lease did not include an exclusive right to litigate unpaid accrued royalties. Second, Shelton argues that the King Ranch's powers, if any, to prosecute and settle Shelton's claim were revoked. Third, Shelton argues that the exercise of the King Ranch's powers amounted to the unauthorized practice of law. Fourth, Shelton argues that the settlement is void or voidable because the King Ranch acted despite a conflict of interest with Shelton and without Shelton's informed consent. These four issues are legal only and are ripe for decision.

### A. *Royalty Payments are Obligations of the Lease*

Shelton urges that the making of proper royalty payments is not an obligation of the lease, arguing that "royalty" has at least two meanings in Texas oil and gas law. Shelton maintains that a "royalty interest" is realty, citing *Phillips Petroleum v. Adams,* 513 F.2d 355 (5th Cir.1975), *cert. denied,* 423 U.S. 930, 96 S.Ct. 281, 46 L.Ed.2d 259. On the other hand, Shelton argues, the accrued liability to make a "royalty payment" is personalty. *Id.* That

---

**2.** The quoted language is most susceptible to Shelton's challenge. Since the Court finds Shelton's challenge to be without merit as to this language, the language from other similar transfers is not considered.

distinction, of course, means that a mineral deed, while transferring the royalty interest and the right to future royalties, does not usually transfer a claim for past due royalty. *Id.* at 363. It does not follow, however, that a mineral interest deed can not affect the right to litigate the computation of royalties, especially when at the time of the transfer the royalties in question are not yet accrued. Furthermore, even if Shelton's claim is personal property, the issue is whether Exxon's duty to pay is an obligation of the lease.

■ In Texas the royalty due and to be paid is determined from the provisions of the oil and gas lease. *See, e.g., Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 870 (Tex.1968). The agreement to pay royalties is a contractual obligation arising from the lease. *Shell Oil Co. v. State,* 442 S.W.2d 457, 459 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.). Shelton argues that the obligation to pay royalties results simply from the extraction of minerals from the land. Shelton's theory, then, is one of conversion or trespass, which occurs when oil or gas is taken without right. *See generally* 1 Williams & Myers, Oil and Gas Law §§ 225–226.2 (1988). However, when minerals are converted in this manner the resulting liability is tortious, not contractual. The converting party can be made to pay the value of the minerals converted, although the place of valuation and credit for costs of production may vary. *See id.* Under a theory of conversion the obligation is to pay compensation for a tort. It is not a royalty. *Compare Shell Oil Co. v. State,* 442 S.W.2d at 459 (where lease specifies the royalty payable, lessor must sue for contractual royalties, not for accounting of the profits made). Furthermore, the oil and gas lease passes title to the minerals to the lessee. *Read v. Britain,* 414 S.W.2d 483, 487 (Tex. Civ.App.—Amarillo), *aff'd,* 422 S.W.2d 902 (Tex.1967). The lessee can not convert minerals to which it has title.

■ By contrast, "[t]he *agreement* to pay gas royalties *provided for in the lease* is a personal *obligation* on the part of the lessee to pay a specific *fractional part* of

the gas conveyed to the lessees." *Id.* (emphasis added) Therefore, the King Ranch's reservation of the power to enforce the obligations of the lease included the power to enforce royalty payments. There is no reason for that power to end with the severance of gas from the land. Since on its face the lease unambiguously reserved or granted to the King Ranch the exclusive power to enforce royalty payments, the King Ranch's settlement with Exxon on behalf of Shelton was valid and binding unless (i) the grant or reservation was void or ineffective, or (ii) that power was revoked, or (iii) the power could not be invoked by the King Ranch without breaching some duty to Shelton.

### B. The Validity of the Enforcement Powers and their Reservation

■ Shelton argues that the powers the King Ranch reserved were void because they amounted to the unauthorized practice of law. The cases cited by Shelton to support his proposition are inapposite. Each of the cases cited by Shelton addresses the actions of an agent who had no connection to the business of the principal other than the resolution of a dispute in which the agent had no interest. *See Touchy v. Houston Legal Foundation,* 432 S.W.2d 690 (Tex.1968); *Hexter Title & Abstract Co. v. Grievance Committee,* 142 Tex. 506, 179 S.W.2d 946 (1944); *Brown v. Unauthorized Practice of Law Committee,* 742 S.W.2d 34 (Tex.App.—Dallas 1987, no writ). Clearly, that is not the case here. Shelton's dealings with the King Ranch have been long and complex and their common interests can be traced back to transfers that they or their predecessors made. They own undivided interests in the same minerals. As discussed below, what they have in common, whether it is called the King Ranch's interest or desire for security, is recognized by the law of Texas. Furthermore, the King Ranch's right to settle the other mineral interest owners' claims as it settled its own seems appropriate, especially in light of the language used to describe the powers.

The power to enforce the obligations of the lease was considered by the parties to be an additional executive power. The Court is of the opinion that the extent of the King Ranch's powers—and whether those powers constituted the unauthorized practice of law—should be governed by Texas cases delineating the permissible extent of executive powers in the oil and gas context.

Executive rights are sometimes considered irrevocable powers of attorney. *See, e.g., Allison v. Smith,* 278 S.W.2d 940, 945 (Tex.Civ.App.—Eastland 1955, writ ref'd n.r.e.); *Odstrcil v. McGlaun,* 230 S.W.2d 353, 354 (Tex.Civ.App.—Eastland 1950, no writ). A person holding a power of attorney is known as an attorney in fact. *Olive–Sternenberg Lumber Co. v. Gordon,* 143 S.W.2d 694, 698 (Tex.Civ.App.—Beaumont 1940), *rev'd on other grounds,* 138 Tex. 459, 159 S.W.2d 845 (1942). It appears that in Texas attorneys in fact may have certain powers associated with the settlement of disputes. *See, e.g., Gouldy v. Metcalf,* 75 Tex. 455, 12 S.W. 830, 831 (1889) (assignment for the benefit of creditors may be made by an authorized attorney in fact). *See also* 17 Tex.Jur.3d *Creditor's Rights* § 97 (1982). Two Texas cases have specifically held that a fully authorized agent who is not an attorney may represent his principal in court simply by employing an attorney on behalf of his principal. *See Hanrick v. Gurley,* 93 Tex. 458, 54 S.W. 347, 352 (1899); *Broughton v. Humble Oil & Refining Co.,* 105 S.W.2d 480, 484 (Tex.Civ.App.—El Paso 1937, writ ref'd). In *Broughton* the agent was only "verbally appointed and empowered ... to manage and look after [the realty of his principal]." *Id.* Nevertheless, the court held that the agent acted within his authority in engaging attorneys to represent his principal in court. *Id.*

The Court believes that these cases establish that the King Ranch was empowered to represent Shelton in court through an attorney and that the King Ranch's representation of Shelton in negotiations with Exxon did not constitute the unauthorized practice of law. The Court can conceive of no reason why the King Ranch should not also have had the power to settle Shelton's claim out of court, if that power was not revoked and was properly exercised.

### C. *The Revocability of the King Ranch's Powers*

■ Shelton next argues that the King Ranch's powers to prosecute and settle his claim were revocable and in fact revoked. Shelton argues that the power was revocable because it was neither a power coupled with an interest nor a power given for security.

Texas courts have indicated that the irrevocability of executive rights over mineral interests is inadequately justified by the theory that the executive rights create a power coupled with an interest. *See, e.g., Pan American Petroleum Corp. v. Cain,* 163 Tex. 323, 355 S.W.2d 506, 508 (1962). *See also* Comment, *The Executive Right,* 42 Tex.L.Rev. 866 (1964). Some courts refuse to name the power. *See, e.g., Cain, supra* (although the court seemed to prefer classifying the power as given "for protection or security of [the executive's] interest"). Other courts say that the power *is* coupled with an interest. *See, e.g., Benge v. Scharbauer,* 254 S.W.2d 236 (Tex.Civ. App.—El Paso 1952), *modified and aff'd,* 152 Tex. 447, 259 S.W.2d 166 (1951); *Superior Oil Co. v. Stanolind Oil & Gas Co.,* 230 S.W.2d 346 (Tex.Civ.App.—Eastland 1950), *aff'd,* 150 Tex. 317, 240 S.W.2d 281 (1951). The problem, of course, is that the powerholder's interest is not really in the subject matter of the power—that is, it is not in the minerals of the non-executive mineral interest holder. Rather, the powerholder's interest is in his own minerals. Nevertheless, the same Texas courts cited above have consistently held that executive rights over mineral interests are irrevocable.

The Court is convinced that the King Ranch's power to enforce the obligations of the lease was considered an irrevocable executive power and that it is sufficiently similar to the power to execute oil and gas leases that it should be considered irrevocable for the same reasons. The King

Ranch's power to enforce the obligation to pay royalties on its mineral interests and the mineral interests of the other owners was just as "coupled" with its interests and as much given for security as was its power to execute oil and gas leases. Therefore, the King Ranch's power to enforce the payment of royalties was irrevocable.

Shelton argues that the King Ranch's power to settle its own claim, and thereby to liquidate Shelton Land and Cattle's right to be paid 11.22% of that claim by the King Ranch, was also revoked. However, Shelton has offered no explanation of how the King Ranch could have severed the settlement of its own claim from Shelton Land and Cattle's right to be paid 11.22% thereof. In fact, the confusion caused by Shelton's position on the King Ranch's power to settle this claim is due to Shelton's insistence that Shelton Land and Cattle held some interest in the King Ranch's claim against Exxon for underpayment of royalties. That is not so. Regardless of the names used in the transfer, its effect was to make Shelton Land and Cattle the King Ranch's creditor on an unliquidated debt. The transfer also reserved to the King Ranch unlimited authority to settle the claim. Since the claim belonged to the King Ranch, that authority or power was not only coupled with an interest belonging to the King Ranch—its interest in the claim—but the power operated over no interest of Shelton Land and Cattle. Shelton Land and Cattle had no interest in the King Ranch's claim, but merely the right to be paid an amount defined by the value of that claim. Even if the King Ranch's power could be said to operate upon an interest belonging to Shelton Land and Cattle, it is clear that the power was taken as security against precisely what Shelton now attempts to do—to litigate the appropriate amount of King Ranch's claim for unpaid royalties. The King Ranch retained the power so that it and Exxon alone could determine the value of Exxon's underpayments without the possibly detrimental interference of Shelton.

Shelton also maintains that the King Ranch's power to settle its own claim was, as to Shelton Land and Cattle's 11.22% of the possible settlement, a revocable naked power. Shelton's legal theory is that the King Ranch's power was not coupled with an interest because the King Ranch had no interest in Shelton Land and Cattle's 11.22% "interest." No one can have an interest in an interest, Shelton urges, although he cites no authority for that proposition. The Texas courts, however, do not refuse to characterize a property right as an interest in an interest. *See, e.g., Manges v. Guerra,* 621 S.W.2d 652, 654 (Tex.Civ. App.—Waco 1981), *rev'd in part on other grounds and aff'd in part,* 673 S.W.2d 180 (Tex.1984) (Cove asserted an "interest in any interest" owned by Manges in the Guerra lands and minerals); *Jones v. Springer,* 256 S.W.2d 1016, 1023 (Tex.Civ.App.— Amarillo 1952, no writ) (when two of the parties partitioned their joint undivided interest, each then owned his one-half interest and an undivided "interest in what ever interest" [sic] the other had).

Even assuming Shelton's proposition correctly states the law of Texas, the Court understands it to mean that Shelton Land and Cattle could not have had an 11.22% "interest" in the King Ranch's interest—its claim. Instead, either Shelton Land and Cattle obtained an unliquidated debt to be paid by the King Ranch, or the King Ranch pledged its claim against Exxon to secure an amount of indebtedness to Shelton Land and Cattle to be determined by the eventual valuation of the claim.

Texas law on the pledging of commercial paper being collected by a lawsuit seems to be that the pledgee [by analogy, Shelton Land and Cattle] and the pledgor [the King Ranch] may provide for suit to be brought and prosecuted by and in the name of the pledgor. A suit by the pledgor under such an agreement, on being prosecuted to judgment, has the effect of relieving the defendant [Exxon] of any liability and of barring any action against him by the pledgee. *See Randolph v. Citizens Nat'l Bank,* 141 S.W.2d 1030, 1032 (Tex.Civ.App.—Amarillo 1940, writ dism'd judgmt cor.). The pledge of commercial paper collectable only by lawsuit seems analogous to the pledge of the proceeds of a cause of action. Under

any theory the result is the same. The King Ranch had the legal authority to settle on behalf of all mineral interest owners. The only remaining issues concern the effects upon Exxon of the facts and the law relating to the King Ranch's manner of exercising that power.

### III. THE KING RANCH'S USE OF THE POWER AND ITS DUTY TO SHELTON

■ Shelton attacks the circumstances and manner in which the King Ranch exercised its power to enforce royalty payments under the leases. Shelton claims that a conflict between his interests and those of the King Ranch rendered the latter incapable of legally exercising its executive powers. It is apparent that the respective negotiating interests of the King Ranch and Shelton were in conflict. The King Ranch would have suffered a heavy tax burden as a personal holding company if it had negotiated a cash settlement on behalf of the mineral interest owners. On the other hand, the prospective increase in the royalty fractions of the mineral interest owners that was eventually negotiated by the King Ranch avoided those adverse tax consequences. Shelton, however, preferred a cash settlement, as both the King Ranch and Exxon were aware.

Shelton claims that as a matter of law this conflict of interest disabled the King Ranch from negotiating on his behalf. As authority for this proposition, Shelton relies heavily on the law of agency and trusts, but he also maintains that acting in the face of this conflict was a breach of the King Ranch's fiduciary duties to the non-executives.

Although the duties of the executive right holder have sometimes been analogized to those of an agent, Shelton is mistaken in his proposition that Texas oil and gas law requires the interests of the executive and the non-executive to be one. On the contrary, one of the economic and legal justifications for the alienation of the executive rights is the resultant power of the executive right holder to disregard the wishes of the non-executive. *See Allison v. Smith,* 278 S.W.2d at 946 (executive right holder may disregard any instructions from other fractional owners as long as he acts in good faith). Although the duties of the executive to the non-executive have been described as fiduciary—a term that has been rather loosely used—the Texas cases have circumscribed a rather narrow range of behavior as violative of that duty. The following is a helpful working definition of the duty: "That duty requires the holder of the executive right ... to acquire for the non-executive every benefit that he exacts for himself." *Manges v. Guerra,* 673 S.W.2d at 183.

The precise meaning of the quoted language is best understood through analyzing the cases that have found a breach of the executive's duties. *All* those cases deal with executives exercising their executive rights so as to exact from the other contracting party a direct benefit which, if named differently or taken in a different manner, could have been shared by the non-executive. *See id. See also Comanche Land & Cattle Co. v. Adams,* 688 S.W.2d 914 (Tex.App.—Eastland 1985, no writ); *Kimsey v. Fore,* 593 S.W.2d 107 (Tex.Civ.App.—Beaumont 1979); *Portwood v. Buckalew,* 521 S.W.2d 904 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r.e.). Breach of the executive duties consists of taking benefits that should have been shared with the non-executive. The cases finding such a breach all deal with disproportionate benefits or inappropriate consideration inuring to the executives under the terms of the contract or lease or as a result of its execution. An element of unjust enrichment or self dealing is common to the cases. *See Heritage Resources, Inc. v. Anschutz Corp.,* 689 S.W.2d 952, 956 (Tex.App.—El Paso 1985, writ ref'd n.r.e.) (*Manges* distinguished as "a case where one party by some wrongdoing sought to obtain an unjust enrichment"). There is no unjust enrichment here because the tax advantage enjoyed by the King Ranch could not have benefitted Shelton. Furthermore, the evidence showed that the King Ranch settled for a prospective royalty increase not to enjoy a new, previously unobtained tax advantage, but merely to maintain its status

of not constituting a personal holding company.

The facts of this case differ markedly from the facts of the cases relied upon by Shelton. Here, even if the King Ranch settled the royalty dispute in return for a prospective increase in the royalty share for no reason other than its own tax advantage, it still received no contractual benefits from Exxon not received by all other mineral interest owners. The only consideration for the release of the claim for unpaid royalties—the prospective royalty increase—was shared equally by all mineral interest owners. Any tax advantage enjoyed by the King Ranch because of the form of payment is incidental and irrelevant. To hold otherwise would force the executive right holder to scrutinize and cater to the particular tax position of each mineral interest owner. Certainly, this would lead to irreconcilable differences more often than not. If Shelton's position prevailed, the executive right holder could exercise his rights only on behalf of those non-executives who could maximize their tax benefits—or any other benefit they deem indispensable—in the same manner as the executive. Such an effect would render the executive rights devoid of meaning and value. It is precisely to avoid this dilemma that executive powers may be alienated from the mineral interest.

Shelton introduced some evidence that the King Ranch may have improperly benefitted in some manner other than directly from the settlement with Exxon. The King Ranch could conceivably have benefitted as surface owner or as Exxon's partner in a separate real estate development. However, Shelton's proof did little more than show that the King Ranch had the opportunity and reason to abuse its executive rights. That proof does not suffice.

The crucial factor, however, is that this lawsuit names only Exxon as defendant. To hold Exxon liable as a joint tortfeasor in any wrongs that the King Ranch might have committed, Texas law would require the Court to find that Exxon in some way acted in bad faith or colluded with the King Ranch to Shelton's detriment. *See, e.g.,*

*Kimsey v. Fore,* 593 S.W.2d 107 (Tex.Civ. App.—Beaumont 1979, writ ref'd n.r.e.). *Cf. Remenchik v. Whittington.* 757 S.W.2d 836, 839 (Tex.App.—Houston [14th Dist.] 1988, no writ) (where agent conspired with a third party to divert the funds of his principal). There was no credible evidence to show, or from which the Court could infer, that Exxon acted improperly in negotiating with the King Ranch. On the contrary, the Court finds that Exxon at all times negotiated in good faith with the King Ranch. Exxon's mere knowledge that Shelton disputed the King Ranch's authority to settle on his behalf is immaterial.

## THE SECOND CLAIM

### I.  BACKGROUND

This portion of the Memorandum Opinion resolves the remaining claims in this case.

As a successor in interest to the King Ranch, plaintiff Shelton (but not including Shelton Land and Cattle Company) owns mineral interests covered by the leases. As the operator of those leases, Exxon is required to pay royalties to the mineral interest owners based on the market value of the gas. Shelton claims that Exxon failed to prudently market the King Ranch gas immediately before the enactment of the Natural Gas Policy Act, 15 U.S.C. §§ 3301–3432 (the "NGPA"). Instead, Exxon continued to market the gas to purchasers in the Houston and East Texas areas under long-term corporate warranty contracts. For purposes of royalty payments, Exxon eventually classified much of the King Ranch gas as "§ 109 gas," gas the price of which was limited by NGPA § 109. *See id.* 3319.

In 1981 it became apparent that in Texas, for purposes of a "market value" lease such as the one at issue, the market value of the gas can not exceed its regulated price. *See First Nat'l Bank v. Exxon Corp.,* 622 S.W.2d 80, 81 (Tex.1981) (directly addressing the issue). *See also Exxon Corp. v. Middleton,* 613 S.W.2d 240, 246 (Tex.1981) (where the proposition was dictum). Although the § 109 ceiling price was higher than the contract price for which the King Ranch gas was sold, the market

value lease required Exxon to pay royalties on the gas's market value, which was limited by the regulated ceiling prices for gas sales. Exxon believed that § 109 provided the proper ceiling for the gas in question.

Shelton argues that prior to the effective date of the NGPA, Exxon should have dedicated the King Ranch gas to new contracts at prices that would have allowed the gas to be classified under § 105(b)(2) of the NGPA. No doubt, that classification would have resulted in a higher regulated ceiling price for the gas and, thus, a higher market value and higher royalty payments. Exxon's failure to market the gas in the manner now suggested by Shelton was, according to Shelton, a breach of Exxon's implied duty to prudently market the King Ranch gas.

## II. EXXON'S DEFENSES

In addition to asserting that the King Ranch gas was prudently marketed, Exxon asserts several defenses which, if meritorious, would allow the Court to dispose of this case without reaching the merits of Shelton's allegations.

First, Exxon asserts that the Court should find no implied duty to prudently market the King Ranch gas. Exxon urges that the implied covenant to prudently market the gas, which would otherwise be deemed part of the contract as a matter of law, was not part of the leases in question because Exxon and the King Ranch agreed how the gas would be marketed. According to Exxon, certain letters and memoranda exchanged between Exxon and the King Ranch show that agreement. Furthermore, Exxon argues that the Processing Agreements entered into between Exxon's predecessor and the King Ranch so altered Exxon's duties under the leases as to bar application of an implied duty of marketing. Alternatively, Exxon argues that Shelton, as a successor in interest to the King Ranch, is estopped from asserting an imprudent marketing claim because the King Ranch ratified or acquiesced in Exxon's marketing plan.

The Court finds that Exxon has failed to adduce sufficient proof of its estoppel or acquiescence defense, much less its defense of actual agreement. First, Exxon failed to show that the King Ranch was aware of Exxon's plans to sell all of the King Ranch gas under long-term corporate warranty contracts. Second, it cannot fairly be inferred from the evidence that the King Ranch appreciated or had sufficient knowledge and expertise to appreciate the potential risk of sales under long-term corporate warranty contracts in a market of escalating demand and price. Finally, the Court finds that Exxon did not communicate to the King Ranch sufficient information or as detailed a marketing scheme as would allow the Court to find that the King Ranch forfeited the benefits of the implied covenant of prudent marketing. Thus, these defenses fail because Exxon neither formulated a marketing scheme capable of displacing the implied covenant of prudent marketing nor informed the King Ranch of its marketing plans so thoroughly as to gain the King Ranch's acquiescence or ratification of those plans or estop the King Ranch from complaining of Exxon's marketing techniques.

Exxon's next defense is, essentially, that the manner of marketing the King Ranch gas could not have been changed immediately prior to the enactment of the NGPA because the King Ranch gas was effectively committed or dedicated to the corporate warranty contracts—that only King Ranch gas could be used to supply the contracts. In support of this contention Exxon argued that Exxon, its customers, and the King Ranch expected the gas contracts to be supplied by the King Ranch gas and that Exxon needed the King Ranch gas in order to fulfill those contracts. These needs and expectations did not rise to the level of a commitment of the King Ranch gas to the contracts in question. *See Exxon Corp. v. Jefferson Land Co.*, 573 S.W.2d 829, 831 (Tex.Civ.App.—Beaumont 1978, writ ref'd n.r.e.) (where Exxon's same argument was rejected). Obviously, it is a contradiction of terms to assert that gas is committed to a corporate warranty contract, which by its very nature does not designate the origin of gas to be supplied. It would not have

been a breach of contract for Exxon to use gas from other leases to fulfill the corporate warranty contracts. Thus, in 1978 it was within Exxon's legal power to commit the King Ranch gas to the contracts proposed by Shelton.

Exxon asserts that the long-term corporate warranty contracts did not constitute imprudent marketing when they were first entered into in the years prior to 1978. However, Exxon's assertion is misguided. Since Exxon was not legally bound to continue marketing the King Ranch gas in that manner, the real issue is whether it was imprudent for Exxon to continue marketing the gas as it previously had.

■ Finally, by way of a motion for summary judgment, Exxon continues to urge that Shelton's imprudent marketing claims were released by the settlement of June 5, 1980. Although both parties agree that the settlement is unambiguous, they nonetheless dispute its legal effect.

The Court agrees that the language of the settlement, read in its entirety, is unambiguous. In Texas the interpretation of an unambiguous instrument is a question of law for the Court to determine. *Myers v. Gulf Coast Minerals Management Corp.*, 361 S.W.2d 193, 196 (Tex.1962). The Court's primary duty in construing a written instrument, such as this settlement, is to ascertain and effectuate the intentions of the parties as set forth in the instrument as a whole, not merely in its separate parts. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Thus, this Court will consider the entire settlement and construe the provisions so as to harmonize and give effect to all its provisions. *See id.*

The language of the settlement releases Exxon "from any and all claims, causes of the action and liabilities which have arisen or accrued prior to [June 5, 1980,] relating to the amount of royalty payable, paid or which should have been paid under the provisions of The Leases...." Exxon argues that Shelton's imprudent marketing claims relate to the amount of royalty payable under the leases. The Court agrees, although it notes that imprudent marketing only indirectly affects the amount of royalty payable. Exxon further argues that Shelton's cause of action, if any, accrued in November 1978, when Exxon failed to enter into the contracts now proposed by Shelton. The Court again agrees. Nevertheless, in reviewing the entire settlement, the Court concludes that the parties did not intend to release the claims for imprudent marketing.

Although the imprudent marketing claims arose prior to the settlement, at the time of the settlement Exxon had not yet begun to pay royalties based on the market value clause of the leases. Instead, Exxon was paying royalties according to a formula set out in the Processing Agreements. Thus, Exxon's imprudent marketing had not yet produced any damages, and the mineral interest owners did not yet know that Exxon would eventually pay royalties based on a regulated price lower than the price obtainable under the hypothetical contracts. In that sense, the imprudent marketing claim was an unknown claim, not recognized by the parties and not included within the general language of the release.

This conclusion is borne out by other language in the settlement. Two "whereas clauses" serve to clarify the parties' intent. The first of these states that "the parties, by this Settlement Agreement, desire to compromise and settle any and all *past* and *present* disagreements covering the matters and the time periods more particularly set forth below in this Settlement Agreement...." (emphasis added) The Court finds in this language no intent to settle the *future* disagreement that arose after the settlement when Exxon began paying royalties based on the NGPA classification of the King Ranch gas. Furthermore, no claim even remotely like an imprudent marketing claim was "more particularly set forth below in th[e] Settlement Agreement." On the contrary, read as a whole, the settlement indicates that the parties' disagreements were much more mathematical and definitional than related to marketing. For example, the second "whereas clause" indicates that "various disagreements have arisen between the parties relative to gas royalty accounting and the

amount paid as gas royalty under The Leases ... and other matters affecting The Leases...." Again, the Court finds in this language no intent to settle the claims in question.

Furthermore, the Court notes that all other claims—the accounting or calculation claims—relate directly to the amount of royalty payable. The imprudent marketing claim, on the other hand, is only indirectly related to the amount of royalty payable. Imprudent marketing need not have any effect on the amount of royalties payable, so long as the lessee pays as if he had prudently marketed the gas. If the lessee pays the royalties payable on prudently marketed gas, the lessor is not damaged. Thus, the imprudent marketing claim differs from those released by the settlement.

The Court therefore finds that terms and constructions used in the settlement are inconsistent with an intent to release the imprudent marketing claim. The Court finds that the imprudent marketing claim survived the settlement and now addresses that claim on the merits.

### III. THE IMPRUDENT MARKETING CLAIM

The issue before this Court is whether in 1978 it was imprudent for Exxon not to enter into the contracts now proposed by Shelton. "The standard of care in testing the performance of implied covenants by lessees is that of a reasonably prudent operator under the same or similar facts and circumstances." *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 568 (Tex.1981). Exxon argues that a reasonable, prudent operator would not have entered into the contracts in question because it would have been costly to use high-priced gas purchased on the open market to fulfill its corporate warranty contracts in order to allow the King Ranch gas to be sold at market value. Shelton protests that those costs are unrelated to the King Ranch leases; they arise from Exxon's overall, company-wide marketing plan and represent risks inherent to long-term corporate warranty contracts. Relying on *Amoco Production Co. v. Alexander*, 622 S.W.2d 563 (Tex.

1981), *Freeport Sulphur Co. v. American Sulphur Royalty Co.*, 117 Tex. 439, 6 S.W.2d 1039 (1928), and *Amoco Production Co. v. First Baptist Church*, 579 S.W.2d 280 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r.e.), Shelton insists that Texas law does not allow the inclusion of such outside costs as factors in deciding what a reasonable, prudent operator would do to market the gas. This Court agrees.

In *Freeport Sulphur Co.* the Supreme Court of Texas considered that company's implied duty to continue to operate a sulfur plant built on the leased property as called for in the lease. 6 S.W.2d at 1041. Some of the large, unsold stores of sulfur referred to in the opinion appear to have accumulated because the company was simultaneously operating another unrelated sulfur-producing property a few miles away. *See id.* at 1044. Although it did not expressly so rule, the Texas Supreme Court apparently refused to consider the large, unsold stores of sulfur accumulated by the mining company to be a factor justifying the sulfur plant's temporary shutdown. Thus, supply and demand forces external to the lease and created, at least in part, by the operator did not affect the implied duty to operate the plant. *Id.* Since the plaintiffs had set forth a viable cause of action for breach of an implied duty, the case was remanded for trial.

In *First Baptist Church* Amoco obtained an increased contract price for gas already dedicated to that contract. However, in return Amoco dedicated other, previously undedicated leases to that contract at a lower price than it could otherwise have obtained. 579 S.W.2d at 282–83. Amoco's actions were found to be a breach of the implied covenant to prudently market the gas from the previously undedicated leases.

In *Alexander* Amoco failed to protect some of its lessors, the plaintiffs, against field-wide drainage that caused oil to retreat from the plaintiff's lease to other leases held by Amoco. 622 S.W.2d at 565–66. Because Amoco held the leases to which the oil was retreating, it had no economic incentive to prevent the drainage by seeking a regulatory exception that

would have allowed it to produce the oil from the plaintiff's lands. In its simplest form the holding of *Alexander* was that the lessee's duty was to do that which would be done by a reasonable, prudent operator holding only the lease in question. *Id.* at 570. As the *Alexander* court said, "The reasonably prudent operator standard is not to be reduced to the [plaintiffs] because Amoco has other lessors in the same field." *Id.* at 569. *Alexander* also held that a lessor must seek that regulatory relief consistent with reasonable, prudent operation. *Id.* at 570.

■ This Court finds that the facts of the cases discussed above, particularly the *Amoco* cases, are analogous to the facts of this case. Therefore, the Court holds that those cases define and control Exxon's obligations to the plaintiffs at bar. As in *Alexander*, the reasonable, prudent operator standard should not be reduced as to the plaintiffs because Exxon has corporate warranty contracts legally unrelated to the King Ranch leases.

Therefore, the costs cited by Exxon are not, on the facts of this case, an objection to the contracts proposed by Shelton. Exxon was required to market the King Ranch gas in the manner reasonably most profitable for the mineral interest owners and Exxon's operations on the King Ranch leases. Shelton and the other mineral interest owners can not be penalized for Exxon's inability to back its corporate warranty contracts so long as they did not take part in formulating the marketing scheme of which those contracts are a part. Nor should they suffer for Exxon's failure to take the regulatory environment into account in marketing the gas, if it could have done so. Since the marketing scheme was Exxon's own, Exxon is at risk when the prudence of the scheme is judged. That is what this Court must now do.

The NGPA places ceilings on the prices at which different classifications of gas may be sold. The plaintiff demonstrated by credible evidence that the effects of the NGPA were known throughout the oil and gas industry months before the NGPA went into effect. However, in 1978 it was not settled Texas law that "market value," for purposes of market value leases, was limited by the regulated price at which that gas could be sold. If it had been determined that regulated prices did not limit market value, Exxon would have had to continue to pay Shelton royalties based on the higher, unregulated market prices regardless of Exxon's efforts to change the eventual classification of the gas from § 109 to § 105(b)(2) of the NGPA.

The eventual outcome was quite different. In 1981 it was determined that in Texas the market value of gas *is* limited by price regulations. *First Nat'l Bank v. Exxon Corp.*, 622 S.W.2d at 81. Therefore, as Shelton's expert witness, Mr. Bolton, credibly testified, the hypothetical contracts that Exxon could have entered into before the effective date of the NGPA would have benefitted Shelton by increasing the regulated price and the market value of the gas. Although in 1978 the possible benefits of the hypothetical contracts were uncertain, Exxon could have gained these significant benefits for the mineral interest owners without itself incurring costs related to the King Ranch lease operations and without by the same actions subjecting the mineral interest owners to any risks. Prudent marketing required Exxon to do so. Exxon's failure to do so can only be attributed to its interest in fulfilling its corporate warranties without having to purchase gas on the open market. Exxon's method of marketing the King Ranch gas completely subordinated the rights of the mineral interest owners to Exxon's financial gain. Exxon's acts and omissions in so doing were not those of a reasonable, prudent operator having its own and the plaintiff's interests in mind. Thus, Exxon breached its duty to prudently market the King Ranch gas.

## IV. DAMAGES

Shelton's evidence of damages and their calculation was credible and accurate. That evidence remained unimpeached by Exxon. However, Exxon has challenged Shelton's attempt to increase its damage award by an amount corresponding to sev-

erance taxes which Exxon will not pay on the gas. Shelton contends that Exxon can not deduct unpaid severance taxes from royalties; Exxon counters that it is not attempting to do so—that instead, Shelton has calculated a set of numbers improperly inflated by a severance tax factor and unsupported by the evidence and has then argued that Exxon is attempting an improper reimbursement from Shelton. The Court agrees that only Shelton's lower set of numbers are supported by the evidence. Therefore, for the period from September 1, 1980, through December 31, 1984, the Court finds damages in the principal amounts that follow:

| | |
|---|---|
| Robert R. Shelton | $ 1,970,465.63 |
| Shelton Ranch Corporation | $ 5,941,728.00 |
| Shelton Ranches, Incorporated | $ 2,852,604.00 |
| | $10,764,797.63 |

## V. PREJUDGMENT INTEREST

■ In Texas the award of prejudgment interest is mandatory, either as statutory interest pursuant to Article 5069–1.03, or in all but the most exceptional circumstances, in equity. *See Campbell, Athey & Zukowski v. Thomasson*, 863 F.2d 398, 401–02 (5th Cir.1989). *See also Perry Roofing Co. v. Olcott*, 744 S.W.2d 929 (Tex. 1988); Tex.Rev.Civ.Stat.Ann. art. 5069–1.03 (Vernon 1987). Since there was no other rate of interest specified in the contract, this Court may award prejudgment interest at the statutory rate of six percent per annum if it finds that the contract in question ascertains the sum payable. *Id.* This condition requires that the Court find that the contract "provide[d] the conditions upon which liability depends and that it fixe[d] 'a measure by which the sum payable can be ascertained with reasonable certainty.'" *Campbell, Athey*, 863 F.2d at 401 (quoting *Perry Roofing*, 744 S.W.2d at 930 (in turn quoting *La Sara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558, 567 (Tex.1984))).

■ The Court finds that the contracts in question, the King Ranch leases, did provide such a measure. Under the leases Shelton was entitled to a certain, undisputed royalty fraction of the market value of the gas. The Court finds that in the oil and gas industry in general, and on the facts of this case in particular, the term "market value" does provide a measure by which the sum payable can be ascertained with reasonable certainty. Furthermore, the theory upon which this breach of contract case was based also requires the same conclusion. Shelton claimed, and this Court found, that Exxon failed to pay Shelton royalties based on market value sales of the gas. Exxon did not sell the King Ranch gas in question at market value because it did not enter into the market value sales contracts urged by Shelton. In rendering its judgment on the liability issue, separate from damages, this Court had to adjudicate the terms of the King Ranch leases and Exxon's duties under those leases. Having done so, and having determined that Exxon was liable for some amount of damages, the amount of damages was completely defined by the contracts into which Exxon should have entered. Shelton's damages were simply the difference between the royalties paid to him and those that would have been paid to him under market value sales contracts. This Court had only to take evidence on the market value of natural gas, a concept subject to definite calculation and necessarily determined in adjudicating liability. Exxon's only objections to Shelton's method of calculation were based on legal theory, not on fact or mathematical method. Once Exxon's legal objections were overruled it accepted the calculations as accurate.

*Lubrizol Corp. v. Cardinal Const. Co.*, 868 F.2d 767 (5th Cir.1989), a case in which the contract did clearly set forth an ascertainable measure of damages, provides some insight useful to this case. The contract in *Lubrizol* provided that upon failure to perform "the cost of such performance and completion shall be deducted from the portion of the Contract Sum not paid to the Contractor prior to the time that the Work is taken over from the Contractor." *Id.* at 772. That language was held to have "[set] out in as reasonably ascertainable a fashion as is practical what the measure of default damages will be," *id.*, even though two facts crucial to the computation of

damages were not and could not have been set forth in the contract or determined as readily as can the measure of damages in this case. Those factors were the cost of performance and completion, and the portion of the contract sum not paid to the contractor prior to the time that the work was taken over from the contractor. Furthermore, those facts were not necessarily ascertained in determining whether a breach had occurred, as the measure of damages—market value—was in this case.

Therefore, this Court awards Shelton prejudgment interest on the principle amount of his damages at the rate of six percent per annum compounded annually.

■ Exxon contends that the principal amount on which interest accrues should not include the ⅟₄₈ royalty increase which resulted from the 1980 settlement. Because the royalty increase was withheld from Shelton's royalty payments pursuant to Shelton's request, Exxon argues that it should not be required to pay interest on that amount. The Court disagrees. Shelton has always maintained that he was not bound by the 1980 settlement. The Court has sustained Shelton's contention insofar as it found that the 1980 settlement did not release Shelton's claims for imprudent marketing. Because he wished to preserve his right to challenge the settlement, Shelton requested that his royalty payments not include the additional ⅟₄₈ provided by the settlement. To have accepted the ⅟₄₈ additional royalties might have estopped Shelton from challenging a settlement which the Court found did not release all of Shelton's claims. Thus, the Court will not deny interest on an amount necessarily foregone by Shelton and in fact detained by Exxon. Interest shall accrue on the entire principal amount of Shelton's damages.

## VI. ATTORNEY'S FEES

■ Section 38.001 of the Texas Civil Practice and Remedies Code provides for attorney's fees in suits for a breach of contract. A suit for the breach of an oil and gas lease is a suit on a contract within the meaning of section 38.001. *Cf. Verble*

*v. Coffman*, 680 S.W.2d 69, 71 (Tex.App.—Austin 1984, no writ) (construing predecessor of 38.001). Shelton is therefore mandatorily entitled to attorney's fees. *See Gerdes v. Mustang Exploration Co.*, 666 S.W.2d 640, 645 (Tex.App.—Corpus Christi 1984, no writ) (discussing mandatory nature of award). Shelton's expert witness credibly testified that in view of the novelty and complexity of the issues, the time and effort expended, the risks involved, the competence of counsel, and the sums involved, a reasonable and proper fee would be one-third of the amount of Shelton's recovery from Exxon. That evidence was unrebutted, as was further evidence that a contingency fee would be usual and customary in a case of this type. *See also* Tex.Civ.Prac. & Rem.Code Ann. 38.003 (Vernon 1986) ("It is presumed that the usual and customary attorney's fees for a claim ... are reasonable."). The Court agrees with this characterization of the merits of Shelton's request for attorney fees and therefore awards Shelton attorney's fees of one-third of the amount of Shelton's total recovery of principal and prejudgment interest.

## VII. EXXON'S COUNTERCLAIM

Exxon's counterclaim against Shelton seeks to recoup Exxon's overpayment of royalties to Shelton. Exxon claims that its royalty payments to Shelton and other mineral interest owners were erroneously based on a market value equal to the ceiling price of § 109 of the NGPA. Exxon claims that royalties should actually have been based on the proper classification of the gas as § 105(b)(1) gas.

The Court finds that Exxon failed to adduce sufficient evidence at trial to prove (i) the amount of royalty payments actually made to Shelton and (ii) what the royalty payments would have been had they been based on § 105(b)(1) of the NGPA. Furthermore, Exxon's counterclaim is premised on a finding that Exxon prudently marketed the King Ranch gas. The Court has rejected that premise. Thus, Exxon takes nothing on its counterclaim against Shelton.

## CONCLUSION

The King Ranch had the authority to bind Shelton by the settlement of June 5, 1980. As to those of Shelton's claims accruing before September 1, 1980, and made the subject of the settlement of June 5, 1980, Exxon is released by the settlement and Shelton takes nothing. Shelton's imprudent marketing claim, however, was not released by the settlement. As to that claim, the Court finds for the Shelton plaintiffs. Exxon shall pay the Shelton plaintiffs $10,764,797.63, as itemized by the Court, with prejudgment interest at six percent per annum compounded annually.

The plaintiffs shall submit a proposed judgment which shall calculate prejudgment interest from the proper date. The proposed judgment shall also be submitted to Exxon's counsel for approval as to form.