Robert R. SHELTON, Shelton Ranch Corporation, Shelton Interest, Inc., Shelton Ranches, Inc., Shelton Land and Cattle Company, and W.E. Harwood Trust, W.E. Harwood, Trustee, Plaintiffs/Appellants/Cross–Appellees,

v.

EXXON CORPORATION, Defendant/Appellee/Cross–Appellant.

No. 89–6053.

United States Court of Appeals, Fifth Circuit.

Jan. 22, 1991.

P. Graham, Baker & Botts, Barry L. Wertz, McGinnis, Lochridge & Kilgore, William Blanton, Houston, Tex., for defendant/appellee/cross-appellant.

Before CLARK, Chief Judge, and HIGGINBOTHAM, Circuit Judge, and SCHWARTZ,[*] District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In this diversity suit we face issues controlled by Texas oil-and-gas law assisted by a thoughtful and detailed district court opinion that followed a bench trial. It is also a case with fabled Texas figures, even those of modern day. Both sides appeal portions of the district court's judgment. 719 F.Supp. 537. Shelton challenges the district court's denial of Shelton's claim for underpayment of royalties for the period between July of 1973 and September of 1980. We affirm that holding. Exxon attacks the district court's holding that Shelton *is* entitled to damages for loss of royalties for Exxon's imprudent marketing for the period between September of 1980 and December of 1984. We reverse this holding.

### I.

Until 1977 Robert Shelton had been the executive vice president, treasurer, and a member of the Board of Directors of King Ranch. He had also been King Ranch's largest shareholder and had owned a sizeable share of the mineral interests located on the King Ranch. In 1976 he exchanged stock in the ranch for a mixture of its physical assets. The balance of his King Ranch stock was redeemed the following year. On December 31, 1977, King Ranch distributed most of its mineral interests to its shareholders, through mineral and royalty deeds, including Mr. Shelton and his various corporations—Shelton Ranch Corporation, Shelton Interests, Shelton

Joseph D. Jamail, Gus Kolius, Jamail, Kolius & Mithoff, Joe H. Foy, Mary Katherine Kennedy, Deanne M. Noel, Bracewell & Patterson, Houston, Tex., for plaintiffs/appellants/cross-appellees.

Michael A. Short, Midland, Tex., Frank G. Harmon, J. Gregory Copeland, Michael

* District Judge for the Eastern District of Louisiana sitting by designation.

Ranches, and Shelton Land & Cattle (collectively, "Shelton"). The distribution of non-executive mineral interests included an "Assignment of Claim" pursuant to which one of the plaintiffs, Shelton Land & Cattle, received an 11.22 percent interest in a pending claim for deficient royalties against Exxon, lessee of the King Ranch mineral interests.

During the 1970's royalties paid by Exxon were a large portion of the King Ranch net income. During that period Robert Shelton, realizing that Exxon's accounting of royalties had not been audited in years, urged King Ranch management to conduct an audit. At Shelton's insistence, King Ranch did so. Investigators concluded that Exxon had not paid all royalties due by the terms of the leases and processing agreements.

Shelton urged King Ranch to sue Exxon. The Ranch refused. Shelton eventually filed suit in Texas state court against Exxon and against King Ranch. Although Shelton brought the suit, Exxon and King Ranch began a series of settlement negotiations and on June 5, 1980, executed a Settlement Agreement—over Mr. Shelton's protests—that purported to release all claims, including Shelton's, for deficiencies in royalty accruing before September 1, 1980. The Settlement Agreement included the following language:

II. *Release of Claims.* Exxon and Ranch Interests hereby settle and compromise the matters in dispute between them as follows:

A. Ranch Interests hereby release Exxon from any and all claims, causes of action and liabilities which have arisen or accrued prior to the effective date of this Settlement Agreement [April 1, 1980] relating to the amount of royalty payable, paid or which should have been paid under the provisions of The Leases and said Processing Agreements (including Exxon's interpretations and applications thereof in this connection) on gaseous hydrocarbons and natural gas liquids produced from or attributable to the lands covered by The Leases *except* as to any adjustment(s) provided for in the letter agreement of January 29, 1979, above mentioned.

(emphasis in original). There was no payment of cash under the settlement; rather the royalty fraction was increased from $\frac{1}{6}$ to $\frac{9}{48}$. King Ranch's experts estimated this $\frac{1}{48}$th increase to be worth $55 million. The same experts estimated King Ranch's total claims for underpayment to be worth as much as $500 million. Because of the perceived inadequacy of the settlement, Shelton refused to accept his share of the increased royalties; he was the only King Ranch mineral-interest owner to do so.

After traveling a complex procedural path,[1] Shelton tried his diversity suit against Exxon in federal district court. At trial Shelton claimed underpayment of natural-gas royalties for two periods: from July 1, 1973 to September 1, 1980, and from September 1, 1980 to December 31, 1984. Shelton first argued that the 1980 settlement did not release claims against Exxon arising before the settlement. However, the district court, reasoning that the clear language of the 1980 settlement *did* release Shelton's claims and that this settlement was authorized by the equally clear language in the mineral and royalty conveyances, ordered plaintiffs to take nothing on the first claim.

As for the second period, Shelton argued that the 1980 settlement did *not* release Shelton's claims against Exxon for failing to market the King Ranch gas prudently and that Exxon indeed imprudently marketed the gas. The court agreed and awarded Shelton approximately $11 million in damages in addition to attorneys fees and prejudgment interest calculated at six percent per annum compounded annually. The total award for the second claim was approximately $22 million.

Shelton appeals the district court's judgment regarding the claim for the first period; Exxon appeals the judgment regarding

---

1. For a recital of most of the procedural history of this case, see *Shelton v. Exxon,* 843 F.2d 212 (5th Cir.1988).

the second. We are persuaded that Shelton cannot prevail on any of his claims against Exxon. We therefore affirm in part and reverse in part.

## II.

### A.

■ The distribution of mineral interests in 1977 included an assignment of claim to Shelton Land & Cattle of an 11.22 percent interest in King Ranch's pending claim against Exxon for deficient royalties. That 11.22 percent derivative interest constitutes approximately two-thirds of Shelton's pre-1980 alleged damages. The critical language in the assignment is as follows:

The assignment is subject, and Assignee [Shelton Land & Cattle] by its acceptance hereof and joinder herein acknowledges and agrees for itself and its successors and assigns, to the retention by Assignor [King Ranch] of the exclusive, full, complete and absolute right and power to prosecute and otherwise deal with any Claim for Additional Royalties in any way Assignor, its successors or assigns see fit, including without limitation the absolute right to waive any Claim for Additional Royalties in its entirety, all without liability to Assignee by reason of such actions; provided however that Assignor agrees to pay to Assignee 11.22% of sums of money or other property or thing of value, if any, recovered by it from Exxon constituting past damages in settlement of any Claim for Additional Royalties. *Assignee shall not be entitled to any payment from Assignor if Assignor shall make settlement of the Claim for Additional Royalties which involves a prospective increase in the royalty* or other benefit which inures directly to all owners of mineral interests subject to the Leases in proportion to their respective ownership interests.

(emphasis added).

Exxon argues that this clause, especially the underscored language, precludes Shelton Land & Cattle's portion of the plaintiffs' pre–1980 claim. The assignment of claim was an additional consideration for King Ranch's redemption of Shelton's stock—that is, additional to and separate from the mineral interests Shelton received in 1977. Thus the restrictive language in the assignment was part of the bargain. The language in the document is unambiguous. Shelton Land & Cattle expressly agreed that King Ranch had the complete power to deal with the entirety of the claim, including the power to waive the claim altogether. King Ranch, in turn, agreed to pay Shelton Land & Cattle 11.22 percent of anything that King Ranch received from Exxon in settlement of the claim. Shelton Land & Cattle also expressly agreed that it would not be entitled to receive anything from King Ranch if the claim were settled by means of a royalty increase that benefitted the mineral interest owners directly. As it turns out, King Ranch settled the claim in precisely that fashion—a fractional increase in future royalties. All the evidence suggests that Shelton, in order to reach a deal, agreed to this restriction with full knowledge of the potential consequences. Thus, Exxon contends, Shelton Land & Cattle should not be allowed to pursue a claim against Exxon in direct contradiction of the clear language of the Assignment of Claim. We agree with this reading of the agreement between the parties and on that basis affirm the district court's judgment as to Shelton Land & Cattle's portion of the first claim.

### B.

The claims of the plaintiffs other than Shelton Land & Cattle are governed by the language in the mineral and royalty deeds and the mineral lease. The following clause, or one similar to it, appears in the documents creating the non-executive mineral and royalty interests:

King Ranch, Inc., Grantor herein, hereby reserves unto itself and its successors and assigns, the exclusive power and right, without the joinder of the Grantees herein, to execute amendments to the Oil, Gas and Mineral Lease of Exxon Corporation now covering the lands described herein and, in the event such Lease terminates for any reason as to all or any portion of such lands ... to exe-

cute future mineral leases covering any of the mineral interests in the lands described herein, or any parts of parts thereof ... Grantees shall be entitled to receive their proportionate part, as herein conveyed to them, of any and all cash payments, bonus payments, rental payments, royalties and other considerations, if any, paid and to be paid under any such leases, contracts and other instruments, as to the mineral interests in land conveyed herein, *but Grantor, its successors and assigns, shall have the exclusive right to enforce the obligations of such existing or future leases, contracts, and other instruments and to contract and negotiate with the lessee thereunder with respect to each such obligation.*

The district court concluded that this language authorized King Ranch to settle Shelton's royalty claims against Exxon and that, therefore, the 1980 settlement bound Shelton. 719 F.Supp. at 541.

Shelton responds with a complicated, and ultimately flawed, argument that focuses on the clause reserving to King Ranch the exclusive right to enforce lease obligations. He first cites *Phillips Petroleum Co. v. Adams,* 513 F.2d 355, 363 (5th Cir.1975), for the proposition that oil and gas are realty in place and personalty upon severance. Since Exxon made royalty payments directly to him, he continues, his claims for past-due royalties are claims to recover personalty. Shelton then suggests that the executive rights reserved by King Ranch, including the right to enforce lease obligations, relate only to King Ranch's interest in the realty and not to Shelton's personalty interest in royalties. For the latter proposition, Shelton cites *Day & Co. v. Texland Petroleum, Inc.,* 786 S.W.2d 667 (Tex.1990), where the Texas Supreme Court stated that an executive right in a mineral interest is itself a property interest and that its transfer is governed by the law of real property. Shelton concludes that, at most, King Ranch was his agent and, as such, did not have the right to settle his claims over his protests.

■ We need not explore the confusing characterization under Texas law of Shelton's right to royalties. Shelton argues that his claim for past due royalties is a claim to recover personalty and not a claim to enforce an obligation of the lease. However, we believe that, even if accrued royalties are personalty, the duty to pay royalties is still an obligation of the lease. The lease defines the royalty obligation. *See Texas Oil & Gas Corporation v. Vela,* 429 S.W.2d 866, 970 (Tex.1968). And it is in the lease that the lessee agrees to recover oil and gas and deliver a share of it to the mineral- and royalty-interest owners. Finally, the lease may also provide for remedies for nonpayment of royalties. *See* H. Williams and C. Meyers, *Oil and Gas Law* § 656. *See generally Shell Oil Company v. State,* 442 S.W.2d 457, 459 (Tex.Civ.App. —Houston [14th Dist.] 1969, writ ref'd n.r. e.).

■ There is a larger problem with Shelton's argument in his characterization of the rights retained by King Ranch. In *Day,* the Texas Supreme Court clarified that "the executive right is a property interest subject to principles of property law when bundled with other rights and attributes comprising the mineral estate." *Day,* 786 S.W.2d at 669. In this sense the executive right held by King Ranch is no different from the non-executive mineral and royalty interests held by Shelton. As the *Day* court went on to explain:

> Other rights and attributes of the mineral estate include the right to receive delay rentals for the deferral of commencement of drilling by the lessee, the right to receive royalty, the right to share in other benefits secured from the leases such as shut in royalties, minimum royalties, production payments and the like, and correlative to the executive right, the right to develop and produce minerals.

*Id.* at 669 n. 1. The court concluded that transfers of executive rights are governed by the law of real property. *Id.* at 669. But that property law governs the transfer of executive rights in no way suggests that the executive right itself encompasses only rights relating to realty. "[T]he owner of

a mineral estate possesses a bundle of interests which can be separated, conveyed or reserved upon any terms the mineral owner deems proper." *Elick v. Champlin Petroleum Co.,* 697 S.W.2d 1, 4 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.).

King Ranch chose to convey non-executive mineral interests and royalty interests but to retain the exclusive power to execute oil and gas leases *and* "the exclusive right to enforce the obligations of such existing or future leases." Because the deeds refer to this reservation as a "reservation of executive rights," Shelton attempts to limit the rights reserved to those usually associated with the executive right, such as "the exclusive right to make a lease." *Campbell v. Dreier,* 382 S.W.2d 179, 183 (Tex.Civ.App.—San Antonio 1964, writ ref'd n.r.e.). But in interpreting the deeds, "the intent of the parties as expressed within the four corners of the instrument controls." *Altman v. Blake,* 712 S.W.2d 117, 118 (Tex.1986); *see also Alford v. Krum,* 671 S.W.2d 870, 872 (Tex.1984); and *Peveto v. Starkey,* 645 S.W.2d 770, 772 (Tex.1982). King Ranch expressly retained the right to enforce lease obligations, and Exxon's agreement to pay royalties was an obligation of the lease. The context of the relevant clause confirms our conclusion; the same sentence grants Shelton a proportionate share of "royalties and other considerations" and reserves the right to enforce lease obligations.

One further point merits brief attention. Shelton also suggests that, if King Ranch had some right to settle Shelton's claims, King Ranch could act only as Shelton's agent. Thus, concludes Shelton, the settlement was invalid either because a conflict of interest destroyed the agency or because King Ranch as agent had no right to settle with Exxon over the objections of Shelton as principal.

■ Although King Ranch certainly owed some duty to Shelton in the exercise of its right to enforce lease obligations, the duty is not defined by principles of agency. Instead, the relevant duty is more akin to the duty of an executive regardless of whether the right to enforce lease obligations is viewed as a part of the executive right or a separate right retained by King Ranch. As the Texas Supreme Court has recently explained, the duties of the executive arise from the relationship itself and the inherent potential for abuse. *Manges v. Guerra,* 673 S.W.2d 180, 183 (Tex.1984). *See also English v. Fischer,* 660 S.W.2d 521, 514–25 (Tex.1983) (Spears concurring). Abuse may occur if the holder of executive rights manipulates lease terms so that benefits usually shared by all mineral owners inure solely to the benefit of the executive. *Compare Manges,* 673 S.W.2d at 180; *Comanche Land & Cattle Co. v. Adams,* 688 S.W.2d 914 (Tex.App.—Eastland 1985, no writ); and *Kimsey v. Fore,* 593 S.W.2d 107 (Tex.Civ.App.—Beaumont 1979, writ ref'd n.r.e.). If King Ranch, as holder of the right to enforce the lease obligations in this action, manipulated settlement terms to its own advantage, it would have violated the executive's duty to act with the "utmost good faith." *Manges,* 673 S.W.2d at 193. This duty "requires the holder of the executive right ... to acquire for the non-executive every benefit that he exacts for himself." *Id.*[2]

■ Although Texas courts have sometimes analogized the duties of the executive to the duties of an agent, the situations are not identical. Texas law does not require that the interests of the executive rights holder and those of the mineral- and royalty-interest holders be one. No trust relationship existed. Therefore, Shelton's argument that he acquired an independent right as a trust beneficiary to sue Exxon

---

2. The duty is arguably less stringent in cases involving owners of royalty interests. One appellate court recently described the duty in these cases as "the duty of an ordinary, prudent landowner." *Pickens v. Hope,* 764 S.W.2d 256 (Tex.App.—San Antonio 1988, writ denied). The difference, opined the *Pickens* court, is that royalty interest owners are not co-tenants in the minerals; thus, there is no "relationship of trust and confidence." *Id.* at 267. Although some of the interests held by Shelton are royalty interests, we need not address the distinction urged in *Pickens* because King Ranch acted within the duty owed to Shelton by either standard.

when King Ranch refused to is without merit.

■ Shelton cites three potential conflicts of interest with King Ranch—King Ranch's involvement with Exxon in a multi-million-dollar real-estate venture, its interest in minimizing the value of Exxon's claim due to an unrelated lawsuit, and its tax preferences. The district court concluded that only the third source of conflict was sufficiently proven and that this diversion of interest did not create a conflict sufficient to vitiate King Ranch's executive authority. The district court reasoned that King Ranch fulfilled its duty because it obtained for all mineral and royalty interest holders the same consideration for release of the claim, a prospective increase in royalties. *Id.* In reaching its conclusion, the district court also emphasized that any other result would be unworkable:

To hold otherwise would force the executive right holder to scrutinize and cater to the particular tax position of each mineral interest owner. Certainly, this would lead to irreconcilable differences more often than not. If Shelton's position prevailed, the executive right holder could exercise his rights only on behalf of those non-executives who could maximize their tax benefits—or any other benefit they deem indispensable—in the same manner as the executive. Such an effect could render the executive rights devoid of meaning and value. It is precisely to avoid this dilemma that executive powers may be alienated from the mineral interest.

*Id.* at 545. We agree.

### III.

■ In his second claim—the imprudent marketing claim—Shelton argues that Exx-

on should have taken a different approach to marketing the King Ranch gas during the period leading up to the enactment of the Natural Gas Policy Act of 1978, 15 U.S.C.A. §§ 3301–3432 (1982). According to Shelton, before the NGPA was enacted[3] Exxon should have stopped marketing the King Ranch gas to corporate customers who purchase gas under long-term warranty contracts; for under the Act gas sold to those customers would be subject to the lower price-ceiling provided in section 109 and would therefore generate smaller royalties. Instead, while continuing to fill those warranty contracts with gas from sources other than King Ranch, Exxon should have sold the King Ranch gas to other customers so as to bring it within the scope of section 105(b)(2)—a classification that would permit higher regulated ceiling prices and thus would yield higher royalties to King Ranch mineral-interest holders. Shelton urged at trial that Exxon's failure to engage in this hypothetical marketing scheme breached an implied covenant to market prudently. Exxon defended on two fronts. First, it argued that the 1980 settlement between itself and King Ranch released any imprudent marketing claim that might have existed.[4] Second, it disputed the claim that it failed to market the King Ranch gas prudently, arguing that it acted as a reasonable operator.

Persuaded by Shelton's arguments, and unconvinced by Exxon's, the court held Exxon liable for damages under the second claim. The court found that although the 1980 settlement agreement was unambiguous the parties did not intend to release the imprudent marketing claims.[5]

The language of the settlement releases Exxon "from any and all claims,

---

**3.** It is undisputed that Exxon officials and King Ranch officials were aware of the contents of the Act before it became law.

**4.** The relevant portion of the 1980 settlement bears quoting again:

Ranch Interests hereby release Exxon from any and all claims, causes of action and liabilities which have arisen or accrued prior to the effective date of this Settlement Agreement

[April 1, 1980] relating to the amount of royalty payable, paid or which should have been paid under the provisions of the Leases and said Processing Agreements....

**5.** Because we read the 1980 settlement to release the imprudent marketing claim and reverse on that ground, we do not reach the district court's finding that Exxon's conduct did not conform to the model of a reasonably prudent operator.

causes of the [sic] action and liabilities which have arisen or accrued prior to [June 5, 1980] [6] relating to the amount of royalty payable, paid or which should have been paid under the provisions of The Leases...." Exxon argues that Shelton's imprudent marketing claims relate to the amount of royalty payable under the leases. *The Court agrees*, although it notes that imprudent marketing only indirectly affects the amount of royalty payable. Exxon further argues that Shelton's cause of action, if any, accrued in November 1978, when Exxon failed to enter into the contracts now proposed by Shelton. *The Court again agrees.* Nevertheless, in reviewing the entire settlement, the Court concludes that the parties did not intend to release the claims for imprudent marketing.

*Shelton v. Exxon Corp.*, 719 F.Supp. 537, 547 (S.D.Tex.1989) (footnote added; emphasis added). In support of this interpretation of the parties' intent the court argued (1) that because on June 5, 1980, no damages had yet accrued from Exxon's imprudent marketing the parties did not know the claim existed and (2) that the language of the release, read as a whole, does not explicitly release imprudent-marketing claims.

■ We find the district court's rationale, though not without force, ultimately unpersuasive. For starters, it is irrelevant whether damages had occurred before the settlement. Under Texas law a claim accrues when facts come into existence that entitle the plaintiff to bring suit. *General Motors Acceptance Corp. v. Howard*, 487 S.W.2d 708, 710 (Tex.1972). Typically a claim accrues on the date of the breach, even if damages appear later. *Smith v. Fairbanks, Morse & Co.*, 101 Tex. 24, 102

S.W. 908, 909 (1907) (action for breach of contract). Thus, even if, as Shelton asserts, the allegedly imprudent marketing generated damages only after the effective-date of the settlement (a factual claim disputed by Exxon), the imprudent-marketing cause of action still would have accrued in 1978. Perhaps more important, the district court expressly *found* that the cause of action accrued before the settlement agreement took effect.

As to the court's contention that the parties nevertheless were ignorant of the imprudent-marketing claim at the time the settlement was signed, we believe it unnecessary to go beyond the four corners of the settlement agreement. The district court argues that the language in the settlement agreement, taken as a whole, evidences the parties' intent not to release the imprudent-marketing claim. However, the district court gives more weight than we think is warranted to the absence of language specifically releasing claims for imprudent marketing. We are persuaded that the language of the 1980 settlement agreement unambiguously and broadly released "any and all claims, causes of action and liabilities which [arose] or accrued prior to [April 1, 1980]." [7] As we see it, the very purpose of such a broadly worded release is to avoid the risk of encountering such interpretative principles as *ejusdem generis* by enumerating claims to be released at least when the parties were buying complete peace. *See Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1312 (5th Cir.1983) (enforcing broadly worded release).

■ Whether a written agreement is ambiguous or whether it clearly demonstrates the intent of the parties is a question of law. *Broad v. Rockwell Int'l*

---

**6.** The "[June 5, 1980]" effective date inserted in the quote was done so by the trial court. The settlement agreement provides, however, that its provisions shall be "effective retroactively to April 1, 1980." Settlement Agreement, at 9.

**7.** At one place in its opinion the district court stresses that the claims purported to be released by the settlement agreement were only those "relating to the amount of royalty payable, paid

or which should have been paid under the provisions of The Leases and Processing Agreements." The court implies that since the imprudent-marketing claim is only "indirectly" related to royalties that claim was not meant to be included in the release. 719 F.Supp. at 548. But the court elsewhere found that the imprudent-marketing claim *did* relate to royalties payable under the leases. *Id.* at 547.

*Corp.,* 642 F.2d 929, 948 (5th Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). Likewise, as the district court correctly stated, the interpretation of an unambiguous instrument is a question of law. *Myers v. Gulf Coast Minerals Management Corp.,* 361 S.W.2d 193, 196 (Tex.1962). The applicable rule of contract construction is that unambiguous language in a contract should be enforced as written, *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981), and objective intent rather than subjective intent controls, *id., cited in Watkins v. Petro–Search, Inc.,* 689 F.2d 537, 538 (5th Cir.1982).[8] Moreover, this is true whether or not the injured party has knowledge of the breach. *United States v. Lovknit Mfg. Co.,* 189 F.2d 454, 457 (5th Cir.), *cert. denied,* 342 U.S. 896, 72 S.Ct. 229, 96 L.Ed. 671 (1951). These were sophisticated parties with able counsel on both sides. Our task is to enforce their agreement, as written.

The parties' fight over the imprudent marketing claim is innovative and powerfully presented. But on reflection we are persuaded that King Ranch release their claims agreeing to the unambiguous language of the settlement agreement. Shelton proffers one other noteworthy argu-

ment on this issue. He argues that certain language in the settlement agreement explicitly excluded from the release any claims related to royalties from gas produced after August 31, 1980. Shelton rests his argument on the following language in subsection II(B):

> Such interpretations, constructions and applications shall not be binding in any way on Exxon or the Ranch Interests as to royalty accruing on production from or attributable to the lands covered by The Leases subsequent to August 31, 1980.

However, reading all of subsection II(B), together with the rest of the agreement, it is apparent that the quoted language limits only the method of calculating royalties; it does not limit the scope of the broad release set out in subsection II(A). We reverse the district court's holding as to the second claim and hold that Shelton is entitled to no damages.

AFFIRMED in part and REVERSED in part.

---

**8.** In another context we enforced a similar settlement agreement, noting that the language of the release by itself established the intent of the parties. *Redel's Inc. v. General Elec. Co.,* 498 F.2d 95, 100 and n. 6 (5th Cir.1974).