Revised November 9, 1998

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 97-41023

MARY DRUCILLA McGILL BURNS; KATHLEEN McGILL ENYART;
ALICE ANN McGILL ERCK; FREDERICK ERCK;
ALICE ADAMS McGILL; ESTHER D. McGILL; SCOTT McGILL;
FRANCIS CLAUDIA McGILL STEWART;
and LINDA JANE McGILL WEAKLEY,

Plaintiffs-Appellants,

FIRST CITY BANK-GULFGATE; MBANK ALAMO;
and INTERFIRST BANK HOUSTON,

Intervenor
Plaintiffs-Appellants

VERSUS

EXXON CORPORATION,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

November 4, 1998

Before KING, SMITH, and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Plaintiffs-appellants and intervenor plaintiffs-appellants

("the McGills") appeal from the district court's grant of two

1

partial summary judgments and a subsequent, final take-nothing judgment thereon in favor of appellee, Exxon Corporation. Additionally, the McGills contend that the district court abused its discretion in refusing to compel Exxon to produce certain documents and also in denying the McGills leave to file a supplemental complaint. For the following reasons, we affirm.

## I.   Background and Procedural History

The McGills are royalty interest owners under two oil and gas leases executed with Exxon (formerly Humble Oil). The oil and gas leases include a 1935 lease and a 1941 lease covering more than 30,000 acres of land in Brooks, Hidalgo, Jim Hogg, and Starr Counties, Texas (hereinafter "the McGill leases"). Until 1960, the McGill leases unquestionably governed the royalties paid to the McGills. On June 20, 1960, however, the McGills and Exxon amended the royalty provisions of the McGill leases to require payment of specified royalties on residue gas and plant products extracted from gas processed at a gas processing plant then under construction, the King Ranch Gas Plant (hereinafter "the King Ranch Processing Agreement").

The royalty provisions of the two McGill leases are identical and provide in pertinent part:

> The royalties paid by the lessee are . . . (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one eighth of the gas so sold or used, provided that on gas sold at the wells the royalty

2

shall be one-eighth of the amount realized from such sale; . . .

Under the McGill lease royalty provisions, the McGills were entitled to receive royalties: (1) on residue gas based upon 1/8 of the market value of the residue gas at the wells; and (2) on volumes of gas used in the manufacture of gasoline or other plant products based upon 1/8 of the market value of the gas at the well before processing. The McGills were not entitled to receive royalties based upon the value of the processed plant products.

The royalty provisions of the King Ranch Processing Agreement supersede the royalty provisions of the McGill leases to the extent that the two are in conflict. The agreement provides separate royalty terms for plant products and residue gas. In determining the royalty paid on residue gas, the agreement provides:

> The price per Mcf at which the gas shall be valued in each instance shall be the price per Mcf received during the applicable accounting period for gas *sold at the discharge side of the plant*. In the event the gas is not sold at the discharge side of the plant but instead is taken into Humble's gas transmission facilities for marketing in an area removed from the plant side, *the gas shall be valued at the fair market value*. . . .
> (emphasis added).

Fair market value is defined as the greater of Exxon's field price for gas, the price at which Exxon sells gas to major purchasers, and the weighted average price paid in Texas Railroad Commission District 4.

The King Ranch Processing Agreement amended the royalty provisions of the McGill leases for a period of at least a twenty

3

year term and gave the plaintiffs the right to receive royalties based on part of the value of the processed plant products. The term of the agreement began on the date the King Ranch Plant was placed in operation and continued thereafter until termination as provided in the agreement. Termination could be triggered by any party after the end of the nineteenth year by giving written notice to the other party of the intent to terminate. The termination became effective as to the terminating party one year after notice. Furthermore, Exxon had the right to "limit or curtail, cease entirely, or recommence its gas processing operations (or any portion of such operations)."

From 1960 until 1965, Exxon processed the gas, fractionated the liquid plant products, and sold the residue gas and liquid plant products at the King Ranch Gas Plant. For these five years, the residue gas from the McGill leases was sold in the higher priced unregulated intrastate gas market. On January 29, 1965, however, Exxon entered into an interstate gas sales contract with Trunkline Gas Company ("Trunkline").[1] The contract with Trunkline obligated Exxon to deliver all gas produced from the McGill's property for a period of twenty years. In order to prevent the commingling of gas sold in the intrastate and interstate markets,

_____

[1] After the contract between Exxon and Trunkline in 1965, the gas from the McGill leases became dedicated to interstate commerce and subject to federal price limitations under the Natural Gas Act. The gas remained dedicated to interstate commerce until the Federal Energy Regulatory Commission granted permanent abandonment as of December 1, 1987.

4

which would subject all gas produced at the King Ranch Plant to federal pricing controls, Exxon constructed a separate gas processing facility, the Kelsey Plant, to process gas from the McGill properties. The Kelsey Plant was constructed on the McGill lease after the McGills granted Exxon a surface lease and Trunkline a right-of-way for a pipeline. From September 1966 until April 1988, the McGill's residue gas was sold at the Kelsey Plant for distribution in interstate commerce, and the extracted liquids were transported by pipeline to the King Ranch Plant where the liquids were fractionated into plant products. At all relevant times, the liquid plant products were fractionated and sold only at the tailgate of the King Ranch Plant or were taken and used by Exxon. Since the Kelsey Plant closed in 1988, the gas produced on the McGill leases has been transported to the King Ranch Plant for processing and disposition of both the residue gas and plant liquids.

The McGills filed suit against Exxon in 1985 for underpayment of royalties. The suit was originally filed in state court, but was removed to federal court based on diversity of citizenship. In December, 1986, the McGills filed a motion to compel production of documents reviewed by R.C. Granberry, a former Exxon employee, in preparation for his deposition. In May 1995, the district court denied the motion to compel. In the interim, Mr. Granberry had died.

In January 1991, the parties filed a Joint Pretrial Order

containing the parties agreements, admissions and stipulations. In November, 1991, Exxon filed two motions for partial summary judgment on the two main issues in the case urging the court to hold: (1) that under the market value clauses of the McGill leases, the market value of the residue gas was limited to the regulated interstate market in which the gas was sold; and (2) that the King Ranch Processing Agreement was applicable to and controlled royalty payments on the liquid plant products manufactured from the gas produced on the McGill leases as to plaintiffs Weakley and Enyart from January 1977 to December 1981 and as to all other plaintiffs for all times relevant to this action. In September 1992, the McGills filed cross-motions for summary judgment "on identical issues."

On March 10, 1994, the district court granted Exxon's motion for partial summary judgment, ruling that the "market value at the well" under the McGill leases was limited to interstate prices when calculating royalties on residue gas. On April 11, 1995, the district court granted Exxon's second motion for summary judgment, ruling that the King Ranch Processing Agreement, and not the McGill leases, governed the payment of royalties on liquid plant products.

On June 27, 1995, the McGills sought leave to file a supplemental complaint. The district court denied leave on December 29, 1995. After finding that no other issues remained, the district court rendered final judgment in favor of Exxon on July 6, 1997. This appeal followed.

II.  <u>The March 10, 1994 Partial Summary Judgment</u>

The McGills' first point on appeal is that the district court erred in granting Exxon's first motion for partial summary judgment and holding that the King Ranch Processing Agreement governed the payment of royalties on *liquid* plant products.  We review a trial court's order granting partial summary judgment de novo.  *See* <u>Landry v. Air Line Pilots Ass'n Int'l</u>, 901 F.2d 404, 424 (5th Cir. 1990).  Summary judgment is only appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).

The McGills argue that the royalty provisions of the McGill leases, and not King Ranch Processing Agreement, should have been used to calculate royalties on gas produced from McGill land.  The King Ranch Agreement states it is applicable "to any gas produced [from the McGill leases] which may be processed in the [King Ranch] plant."  The plaintiffs contend that during the relevant period, gas from the McGill leaseholds was being processed only at the Kelsey Plant and that the fractionation of liquids, and not the processing of gas, was occurring at the King Ranch Plant.  Once Exxon stopped shipping any of the three types of gas listed in Article III of the King Ranch Processing Agreement from the McGill leases to the King Ranch Plant, the McGills argue that the King Ranch Processing Agreement ceased to govern the payment of royalties, and thus, the royalty terms reverted to those in the

7

McGill leases.[2]  Exxon, however, argues that "gas processing" continued at the King Ranch Plant because fractionation is only a part of the gas processing procedure, and under Texas law, "gas" includes all constituent elements, including liquid hydrocarbons recovered therefrom.  *See* Sowell v. Natural Gas Pipeline Co., 789 F.2d 1151, 1157 (5th Cir. 1986) (citing Lone Star Gas Co. v. Stein, 41 S.W.2d 48, 49 (Tex. Comm'n App. 1931)).  Therefore, Exxon contends the King Ranch Processing Agreement controls the calculation of royalties on liquid plant products.  We agree with Exxon's contentions, and thus hold that the fractionation of liquids is part of "gas processing operations" within the meaning of this agreement.

The dispute may be simplified as one of contract interpretation--does the agreement permit the sale of residue gas at the Kelsey Plant and the fractionation of plant products at the King Ranch Plant.  "Whether a written agreement is ambiguous or whether it clearly demonstrates the intent of the parties is a question of law."  Shelton v. Exxon Corp., 921 F.2d 595, 602 (5th

---

[2] Article III of the King Ranch Processing Agreement provides, in pertinent part:

> It is understood that there will or may be three types of gas entering the plant: (1) non-associated gas or associated gas, the full well stream of which will be taken into the plant without separation; (2) non-associated gas or associated gas taken into the plant after lease separation; and (3) casinghead gas or gas produced with oil.

Cir. 1991).  This agreement is unambiguous--it applies to *any gas* produced from the McGill leases which may be processed at the King Ranch Plant.  If a contract is unambiguous, construction of the contract is a question of law for the court to decide.  *See* Browning v. Navarro*, 743 F.2d 1069, 1080 (5th Cir. 1984); Brown v. Payne, 176 S.W.2d 306, 308 (Tex. 1943).  Our primary concern is to give effect to the true intentions of the parties as expressed in the written agreement.  *See* Deauville Corp. v. Federated Department Stores, Inc., 756 F.2d 1183, 1193 (5th Cir. 1985);  Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996).  Absent ambiguity, the writing alone will be deemed to express the intention of the parties, and objective intent rather than subjective intent controls.  *See* Sun Oil Co. (Del.) v. Madeley, 626 S.W.2d 726, 728 (Tex. 1981).  The McGills point to a 1965, so-called "smoking gun" memorandum written by B.D. O'Neal, an Exxon engineer, to H.B. Barton, the head of Exxon gas operations, as evidence that Exxon knew the King Ranch Agreement was void.  In the memorandum, O'Neal opines that when Exxon ceased processing McGill gas at the King Ranch Plant, the King Ranch agreement became void.  While the memorandum may evidence an understanding on the part of Exxon senior management of the status of the King Ranch Agreement after the construction of the Kelsey Plant, the memo does not assist the court with construction of the 1960 agreement.  The memorandum would only be helpful in construing the agreement if

9

there was ambiguity on the face of the document.  We must therefore enforce this agreement as written.

Because the express terms of the King Ranch Agreement state that its royalty provisions will supersede earlier leases, the agreement governs the royalties on all residue gas and liquid plant products processed at the King Ranch Plant.  In Article II, the agreement states that the King Ranch Plant was built to gather gas from the McGill leases and other leases in the Railroad Commission District 4, and to process and market residue gas and the liquid and liquefiable products recovered therefrom.  Article II further provides that Exxon "in its discretion may limit or curtail, cease entirely, or recommence its gas processing operations (or any portion of such operations)."  This agreement unambiguously grants Exxon the flexibility to cease, limit or recommence any portion of its gas processing operations at the King Ranch Plant.  This would necessarily include the ability to cease the processing of residue gas at the King Ranch Plant.  Therefore, when Exxon made the decision to process the residue gas at the Kelsey Plant, rather than at the King Ranch Plant with the other gas components, it was merely taking advantage of an express provision in the agreement.  Likewise, because Exxon maintained at all times at least a portion of production at the King Ranch Plant, we do not agree with the McGills' contention that royalty payment terms had reverted back to the McGill leases.  Consequently, the district court did not err by granting summary judgment and holding that the King Ranch

10

Agreement governed royalties on liquid plant products processed at the King Ranch Plant.

III.   <u>The April 11, 1995 Partial Summary Judgment</u>

The McGills' next point on appeal is whether the district court erred by granting Exxon's motion for partial summary judgment and holding that the royalties on *residue gas* should be determined by the fair market value of gas sold on the interstate market. Again, we review the order of a district court granting partial summary judgment de novo.  *See* <u>Landry</u>, 901 F.2d at 424.

Under the King Ranch Processing Agreement, royalties on residue gas processed at the King Ranch Plant would be "valued at the fair market value," determined by three different formulas in the agreement.[3]  The McGills argue that if the agreement applies, then Exxon should have used the agreement to calculate royalties for their residue gas.  While Exxon paid the McGills royalties on liquid plant products under the King Ranch Processing Agreement, Exxon paid the McGills royalties on residue gas under the "market value at the well" terms of the McGill leases based on the interstate prices of gas.  The plaintiffs contend that if Exxon had uniformly applied the King Ranch Processing Agreement to both liquids and residue gas, then Exxon would have been required to pay

---

[3]Article III provides that fair market value would be defined as the *greater* of Exxon's field price for gas, Exxon's sales price to major purchasers, or the weighted average price paid in the Texas Railroad Commission District 4.

the McGills the higher intrastate price for their residue gas. Exxon counters that the royalty provisions of the McGill leases govern the payment of royalties on the residue gas based on the fact that the gas was neither processed nor sold at the King Ranch Plant.

Article V of the King Ranch Processing Agreement provides that the agreement "shall supersede the [McGill leases] . . . only to the extent, that the provisions of [the leases] are in conflict with the provisions of this agreement." Therefore, matters not covered by the agreement will revert to being governed by the McGill leases. The agreement's royalty provisions expressly apply only to products that are processed or sold *at the King Ranch Plant*. Because the McGill's residue gas was processed and sold at the Kelsey Plant and never even entered the King Ranch Plant, it would fall outside the terms of the agreement and would be governed instead by the original McGill leases.

By virtue of the gas royalty provisions in the governing McGill leases, the residue gas royalties will be determined by the market value at the well. The McGills contend that if Exxon is obligated to pay royalties under the market value provision of the McGill leases, then the intrastate market value of the gas should have been used because an intrastate market was always available in which to sell the gas. Because it was dedicated to the interstate market, Exxon argues that the fair market value of the gas cannot

12

exceed its federally regulated price.  The district court held that the gas became dedicated to interstate commerce and subject to federal price ceilings because the gas which Exxon sold to Trunkline was sold in interstate commerce.  In our review, we must address the McGills' contention that the fair market value of *intrastate,* and not *interstate*, gas should be used because an intrastate market in which to sell the residue gas was always available to Exxon.

We agree with the district court's analysis of this issue. Under Texas law, to determine the market value of gas, the gas should be valued as though it is free and available for sale.  *See* Exxon Corp. v. Middleton, 613 S.W.2d 240, 246 (Tex. 1981).  Market value may be calculated using comparable sales, which are those sales of gas which are comparable in time, quality, quantity, and availability of marketing outlets.  *See id.*  Comparable in quality includes both physical and legal characteristics.  *See id.*  To determine legal quality, the court must consider whether the gas is sold in a regulated or unregulated market, or in one particular category of a regulated market.  *See id.*  "Intrastate and interstate gas prices are not comparable in [legal] quality."  *Id*. at 248;  *see also* First Nat'l. Bank in Weatherford v. Exxon Corp., 622 S.W.2d 80, 81-82 (Tex. 1981); Kingery v. Continental Oil Co., 626 F.2d 1261, 1264 (5th Cir. 1980).  As this court held in Bowers v. Phillips Petroleum Co., market value for royalty purposes cannot

13

exceed the maximum ceiling price imposed on the gas within that particular federally regulated category. 692 F.2d 1015, 1021 (5th Cir. 1982). Consequently, the "market value at the well" provision in the McGill leases would be determined by comparable interstate sales because the gas that Exxon sold to Trunkline became dedicated to the federally regulated interstate market.

The McGills attempt to distinguish <u>Weatherford</u> and <u>Middleton</u> by arguing that alternative markets were available at the time Exxon dedicated the gas to the interstate market. Nothing in <u>Weatherford</u> or <u>Middleton</u>, nor any of the other cases suggest that the results would have been any different had an alternative intrastate market been available to the producer at the time the gas was committed to an interstate contract. The availability of an intrastate market in which to sell the plaintiffs' gas relates to whether Exxon imprudently marketed the gas, and does not affect the McGills' claim of improper determination of market value.[4] Therefore, because the existence of an alternative intrastate market does not change the result that interstate sales are not comparable to intrastate sales when determining market value, we hold that the trial court was correct in granting Exxon's second

---

[4]The McGills have made no claim that by committing the gas to the interstate market, Exxon breached its implied duty to prudently market the gas. *See* <u>Shelton v. Exxon Corp.</u>, 921 F.2d 595, 602 (5th Cir. 1991); <u>Powell v. Dancigar Oil & Refining Co.</u>, 134 S.W.2d 493, 499 (Tex. Civ. App.--Fort Worth, 1939), *rev'd*, 154 S.W.2d 632 (Tex 1941).

partial summary judgment.

## IV.  Plaintiff's Motion to Compel

The McGills next assert that the district court erred in failing to order production of documents that a former Exxon employee used to refresh his recollection in preparation for his deposition.  We review a district court's order overruling a motion to compel for abuse of discretion.  *See* <u>Scott v. Monsanto Co.</u>, 868 F.2d 786, 793 (5th Cir. 1989).

The McGills contend that R.C. Granberry, a witness for Exxon, used certain documents to refresh his recollection in preparation for his 1985 deposition.  The plaintiffs requested the documents for the purpose of questioning the witness, but Exxon refused, claiming the documents were protected by the attorney-client privilege and the attorney work product doctrine.  The McGills, however,  contend that Exxon waived immunity from discovery under the attorney-client privilege and the work product doctrine by making the documents available to the witness.  In December 1985, the McGills filed a motion to compel.  After an *in camera* review, the district court denied the plaintiffs' motion to compel production of the "Granberry documents" after reaching the following conclusions:  (1) the documents "have absolutely no bearing on the court's [partial summary judgment] on the 'market value' issue"; (2) only a few of the documents appeared "to have even an arguable relation to the 'Processing Agreement' issue"; and

15

(3) withholding of the documents was harmless and moot, based on the information already available to the plaintiffs in the open record and the court's interpretation of the Processing Agreement.

Under Rule 612 of the Federal Rules of Evidence, if a witness uses a writing to refresh his memory before testifying, the trial court is authorized to compel the production of that writing "if the court determines it is necessary in the interests of justice." FED. R. EVID. 612. As in most discovery matters, the district court has broad discretion and should only be reversed in an unusual and exceptional case. *See* O'Malley v. United States Fidelity & Guar. Co., 776 F.2d 494, 499 (5th Cir. 1985). The plaintiffs have failed to show that they have a substantial need for the documents or that production was necessary in the interests of justice. If a party claims that the documents contain matters not related to the subject matter of the testimony, Rule 612 authorizes the court to make an *in camera* inspection and refuse to order production of documents not so related. *See* FED. R. EVID. 612. Consequently, the district was well within its discretion to refuse to order production of the documents after making an *in camera* inspection and determining that the documents had little or no relation to the subject matter of Granberry's testimony.

## V. Plaintiff's Supplemental Complaint

Next, the McGills claim the district court erred in denying them leave to file a supplemental complaint. We review the

16

district court's denial of leave to file a supplemental complaint for abuse of discretion. *See* Lowery v. Texas A&M Univ. Sys., 117 F.3d 242, 245 (5th Cir. 1997).

On June 27, 1995, after the district court had granted both of Exxon's motions for partial summary judgment, the McGills filed their motion for leave to file a supplemental complaint under Rule 15(d) of the Federal Rules of Civil Procedure. The district court denied the motion for leave without comment.

Under Rule 15(d), the court may permit a party to file a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. *See* FED. R. CIV. P. 15(d). The McGills have failed to show, either in its motion to compel filed with the district court or in its briefs filed with this court, that any transaction or occurrence or event has transpired in the ten years since they filed their original complaint. The McGills cite to several cases holding that leave to *amend* should be freely granted under Rule 15(a).[5] While the text of Rule 15(a) provides that leave should be freely granted, the text of Rule 15(d) does not similarly provide. Rule 15(d) is clear that the court *may* permit a supplemental pleading setting forth changed circumstances. Here,

---

[5] Rule 15(a) provides in pertinent part: "[A] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely give when justice so requires." FED. R. CIV. P. 15(a).

17

as nothing has changed except for the granting of Exxon's motions for partial summary judgment, the court was within its discretion to deny leave to supplement.

## VI.  The Final Judgment

Finally, the McGills argue that the district court erred by rendering final judgment on the entire case when additional issues allegedly remained unresolved.

The McGills contend that the two motions for partial summary judgment did not resolve all the issues in the case, and therefore, should not have served as a basis for final judgment.  The McGills argue that the following three claims remain unresolved:  (1) that after 1985, when the McGill's gas was no longer legally required to be dedicated to the interstate markets, Exxon failed to pay royalties based on the best price available for the gas; (2) that even if the King Ranch Processing Agreement applies, Exxon breached its duty to market the gas and liquids processed at the King Ranch prudently and in good faith; and (3) that the King Ranch Processing Agreement terminated when the McGills filed this lawsuit.  After the plaintiffs filed a supplemental brief in the district court describing the issues which they believe remain unresolved, the court ruled that the first two "unresolved issues" were foreclosed by the March 10, 1994 or April 11, 1995 orders granting partial summary judgment, and the third "unresolved issue" was not raised until after the district court granted Exxon's second partial motion for summary judgment.

18

We agree.  The first two claims are indeed foreclosed by the orders granting summary judgment.  The third issue--the termination of the King Ranch Processing Agreement upon the filing of this suit was never raised by the McGills either in the Consolidated Amended Appeal, the joint pretrial order, or in response to Exxon's motions for summary judgment.  The first time the McGills pleaded this theory was in their Motion for Leave to File Supplemental Complaint.  Because the district court did not abuse its discretion in denying leave to file the supplemental complaint, it was therefore not error for the court to decline to address the merits of this argument.

Therefore, for the foregoing reasons, we AFFIRM.

JERRY E. SMITH, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from part II of the majority opinion. That part affirms the holding that the King Ranch Processing Agreement (the "Agreement"), rather than the McGill leases, governed royalties on liquid plant products.

The original McGill leases provided more favorable royalty treatment of liquid gas products than did the Agreement. The McGills argue that those leases, and not the Agreement, should govern the liquids that are separated from the residue gas at the Kelsey plant but fractionated at the King Ranch plant. I agree.

The Agreement applies by its terms to "any gas produced [from the McGill leases] which may be processed in the [King Ranch] plant." The McGills' argument is twofold: (1) None of their "gas" was processed at the King Ranch plant; all that was processed at King Ranch was liquids; and (2) what was done at King Ranch was not "processing," but "fractionating." I find compelling a variant on the "gas" argument: An examination of the Agreement shows that it did not provide for the treatment of liquids sent to the King Ranch plant only for fractionation.

The McGills point to language in the Agreement stating that "there will or may be three types of gas entering the plant:" (1) full well stream gas, (2) gas that has been run through a separator on the lease, and (3) casing head gas. In a footnote, the majority

quotes this passage but does not deal with it in any way. To the contrary, I believe the passage is dispositive on this issue, for, obviously, the liquids from the McGill leases that entered the plant were not any of the three types of gas contemplated under the lease.

Exxon, in turn, points to caselaw that holds "gas" to include all the component parts of that which comes out of the well. *See Sowell v. Natural Gas Pipeline Co.*, 789 F.2d 1151, 1157 (5th Cir. 1986). Neither *Sowell* nor the case upon which it is based, *Lone Star Gas Co. v. Stine*, 41 S.W.2d 48, 49 (Tex. Comm'n App. 1931, judgment adopted), provides the unmitigated support that Exxon seems to assign to it.

The leases at issue in *Sowell* specifically provided for royalties on "sulfur-free gas produced *in its natural state*." *See Sowell*, 789 F.2d at 1157 (emphasis added). Therefore, the royalty owners could not claim royalties based upon the separate value of liquid hydrocarbons that condensed downstream from meters located on the lease. Under that agreement, "it is production that triggers the royalty obligation." *Id.* The gas as producedSSin its "natural state"SSincluded those hydrocarbons in gaseous form, so the royalty owners were compensated only on the basis of their gaseous form. The *Sowell* court did not hold that "gas" always includes all gas products; rather it was limited by the provisions of the lease at issue stating that royalties would be based on gas

21

"in its natural state."

Here, the Agreement specifically contemplated the various manifestations of hydrocarbon molecules and set compensation levels accordingly. It provided royalties on plant productsSSbutane, propane, and other value-added products. Those royalties were explicitly based on the state in which the gas arrived at the King Ranch plant. Thus, products that are "extracted from gas delivered to the plant without prior separation of liquids from the gas shall be based on 100% of the value at the plant of the plant products allocated to such gas." On the other hand, for gas that arrived at the King Ranch plant that "prior to delivery to the plant has been run through a separator[6] on the lease," the royalty would be based upon only a third or less of the plant products actually produced from that gas.

Thus, the Agreement specifically contemplated that the full well stream, containing all the liquids, was much more valuable than gas that arrived at the plant with some liquids missing. Unlike the agreement in *Sowell*, the agreement here did not treat "gas" as including all the component parts of the full well stream.

Furthermore, and perhaps more importantly, there is the specific and unambiguous language of the Agreement to which we must give effect. The Agreement purports to cover three specific types

---

[6] A separator removes some liquids from the well head stream but does so incompletely. The Kelsey plant was not merely a separator, but was a *bona fide* processing plant that completely removed the liquids from the gas, so that all that was left was residue gas.

of gas, types that do not include the product at issue here. Moreover, the Agreement establishes a two-tier system for treating the different sorts of gas, and that system does not address this product. Finally, based upon the overall scheme of the Agreement§§which gives better treatment to products that contain more liquid hydrocarbons§§it is difficult to say that this product, which consists *purely* of liquid hydrocarbons, should be treated unfavorably in the way Exxon has done.

Exxon tries to shoehorn the treatment of liquid hydrocarbons into an agreement that by its terms does not, and by its structure cannot, cover those substances. The Agreement cannot govern the fractionation of these liquid hydrocarbons. While the majority has fashioned a fair and logical case for ruling as it has, I believe it has given insufficient attention to the contract provisions I have discussed. Concluding that, on this specific issue, the result should be otherwise, I respectfully dissent on that issue but concur in the remainder of the opinion.